**Kathy–Jo GRUZINSKI, Petitioner,**

**v.**

### DEPARTMENT OF PUBLIC WELFARE, Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs May 6, 1998.

Decided June 7, 1999.

provisions at 55 Pa.Code § 178.104(e)(3).

Nancy E. Carr, Beaver, for petitioner.

Amy J. Wilson, Pittsburgh, for respondent.

Robert J. Masters, Beaver Falls, for intervenor, Beaver County Children & Youth Services.

Before COLINS, President Judge, and DOYLE, J., SMITH, J., PELLEGRINI, J., FRIEDMAN, J., FLAHERTY, J. and LEADBETTER, J.

FLAHERTY, Judge.

Kathy–Jo Gruzinski (Gruzinski) petitions this court to review a final order of the Secretary of the Department of Public Welfare (DPW), denying her request for adoption assistance for her adopted minor daughter, Laura Lynn Morrison Gruzinski (Laura or child).[1] We reverse.

Laura was born with a cleft palate, cleft jaw and a cleft lip[2] to Suzanne Morrison (Birth Mother) in Beaver County, Pennsylvania on November 25, 1984.[3] Three days later, on November 28, 1984, because Birth Mother was mentally disabled and unable to care for Laura, the Court of Common Pleas of Beaver County, Juvenile Division, (trial court), placed Laura into temporary foster care with a member of the Board of Directors of the Beaver County Children and Youth Services (CYS).

---

1. "Adoption Assistance" is a federal program [Title IV–E of the federal Social Security Act at Section 473(a) and (c) of the Social Security Act, 45 C.F.R. § 1356.40(b)(1), codified at 45 C.F.R. § 1356.40(b)(1)], available to states, and which, in Pennsylvania, is managed and partially funded by the individual county Children and Youth Services agencies, as provided by the regulations adopted at 55 Pa.Code §§ 3140.201–210, and supervised by the Commonwealth's Department of Public Welfare, in order to promote the adoption and care of children with special needs by eligible adoptive parents with financial assistance for that purpose.

There are two types of adoption assistance benefits available: 1) cash subsidy benefits for the ongoing expenses of meeting the special needs of the child and 2) a one-time reimbursement or payment of the non-recurring costs directly related to the legal adoption of a child with special needs, such as attorney fees, psychologists fees for evaluations, etc. Each, and both, are Adoption Assistance Payments. Here, Gruzinski, the adoptive Mother, has requested both.

2. The condition of cleft palate, cleft jaw and cleft lip requires numerous surgeries to correct and requires continued special care over the course of many years.

3. Gruzinski, the adoptive mother, is Birth Mother's sister and Laura's aunt. (C.R. at C57.)

Initially, regular visitation between Birth Mother and Laura was scheduled with the foster parents while Birth Mother was attempting to develop parenting skills.

On January 4, 1985, the trial court adjudicated Laura a dependent of the Commonwealth and remanded her to foster care.

In May of 1985, CYS informed Birth Mother that CYS would take necessary action to terminate her parental rights for the purpose of permanently placing Laura with the temporary foster parents. CYS then filed a petition with the trial court, recommending that Laura be permanently placed with her foster parents for purposes of adoption.

In response to this action by CYS, Birth Mother's brother, Scott Morrison, and his wife, Vanessa (the Morrisons), who resided in Connecticut, determined that they wanted to adopt their niece, Laura.

In May of 1985, the Morrisons filed with the trial court in Beaver County a Petition to Intervene and Change Custody Recommendation, requesting placement of Laura with them for foster care and subsequent adoption in the Connecticut courts.[4] After the completion of a favorable home study evaluation of the Morrison's home (through the Interstate CYS system), the trial court, by order dated October 24, 1985, set aside the recommendation of CYS and placed Laura with the Morrisons in order for them to pursue adopting her in the state of Connecticut. This October 24, 1985 order did not specifically terminate the responsibilities of CYS, but further required that the child remain under the protective supervision of the Beaver County Juvenile Probation Department pending completion of adoption proceedings in Connecticut.[5]

During the pendency of the adoption proceedings in the trial court, the father's parental rights were terminated by a Decree dated September 5, 1987 and the Birth Mother's parental rights were terminated by a Decree dated November 9, 1989.[6]

Although CYS advised the Morrisons that Laura was a child with special needs, CYS did not advise the Morrisons of the potential availability of adoption assistance.[7] The Morrisons pursued the adoption of Laura in Connecticut, but before the adoption could be finalized, the Morrisons separated and divorced. In order to keep Laura in the family, the Morrisons privately placed Laura with Scott Morrison's sister (Laura's aunt), and her husband, who resided in Ohio.

Shortly after Laura began residing with the Gruzinskis, Gruzinski applied for and

---

4. In an October 18, 1985 letter to the Morrisons, CYS stated that it intended to oppose Laura's placement anywhere but with the foster parents. In their Petition to Intervene and Change Custody Recommendation, the Morrisons alleged that one or both foster parents were members of the Board of Directors of Beaver County Children and Youth Services. The Morrisons convinced the trial court that keeping Laura within the natural family would be in the best interest of the child, and, at the least, that their adoption of Laura would provide the child an opportunity to remain in contact with Birth Mother, and would keep Laura connected to her natural family.

5. In Pennsylvania, CYS is a branch of the Department of Public Welfare, while the Beaver County Juvenile Probation Department is a branch of the Unified Judicial System, Beaver County Court of Common Pleas.

6. There was some confusion during the Fair Hearing and the CYS officials testified incorrectly regarding the termination of the parental rights. Both parental rights were terminated by Judge Reed of the Beaver County Court of Common Pleas.

7. Failure of CYS to provide information on the availability of adoption assistance to the adoptive parents constitutes an "extenuating circumstance" and an exception to the federal regulations at 45 C.F.R. § 1356.40(b)(1), requiring that the adoption assistance agreement be signed and in effect at the time of or prior to the final decree of adoption. *See, Policy Interpretation Question*, Log No. ACF–PIQ–92–02, U.S. Department of Health and Human Services, Administration for Children and Families, Issued June 25, 1992. (C.R. at C149–54.)

received AFDC assistance for Laura in the form of medical aid and $199 cash monthly. (C.R. at C53.) [8]

Laura was formally adopted by Gruzinski and her husband on December 6, 1989, by a final decree issued by Judge Reed of the Beaver County trial court.[9]

From the time that Laura was placed with the Morrisons in 1985, until Gruzinski contacted CYS for adoption assistance in May of 1995, CYS had no additional contact with Laura or any of the fostering or adoptive parents. However, there is no evidence that CYS was precluded from being involved. The evidence indicates that CYS chose not to continue to be involved in the processes, since their adoption recommendation was denied by the trial court.

After Gruzinski discovered from private sources that because of Laura's disability, Laura was eligible for further assistance in the form of adoption assistance, Gruzinski telephoned CYS and requested adoption assistance. After being verbally denied for the adoption assistance by CYS, Gruzinski formally requested the Adoption Assistance and an Administrative Fair Hearing (Fair Hearing) by a letter to DPW dated April 8, 1995, and by a follow-up letter to CYS dated May 8, 1995. CYS then formally denied the request by letter to Gruzinski dated May 11, 1995, and scheduled the Fair Hearing.

The Fair Hearing was held on September 27, 1995 at the Office of Hearings and Appeals in Pittsburgh by telephone. The Fair Hearing was conducted by Hearing Officer Ann Strong (Hearing Officer). At the Fair Hearing, CYS was represented by legal counsel and the Director of CYS appeared and testified on behalf of CYS in support of a denial of Adoption Assistance.

On behalf of Laura, Gruzinski appeared pro-se. Scott Morrison, and their expert on adoption assistance, Tim O'Hanlon [10] also appeared and testified. At the conclusion of the testimony, the Hearing Officer accepted further documentation from Gruzinski on October 3, 1995, and from Tim O'Hanlon on October 10, 1995 and entered the documents into the record.

On July 15, 1996, Attorney Examiner Katrina Dunderdale of DPW assumed jurisdiction over the appeal and, after having reviewed the testimony and exhibits, prepared Findings of Facts and a Recommendation and Order for DPW (the Recommendation), recommending that DPW provide Adoption Assistance to Gruzinski on behalf of the child.

DPW adopted the Recommendation in its entirety and entered an order on September 25, 1996 to provide Adoption Assistance to Gruzinski. CYS filed a request for reconsideration with DPW (Request for Reversal) which was granted on October 4, 1996. Gruzinski then filed her response on October 18, 1996, in which Gruzinski outlined with great detail facts material to the outcome that CYS had represented as true, but were, in fact, very inaccurate.[11]

After presumably reviewing the entire record (as was indicated by their order granting reconsideration), DPW entered a Final Order on the Merits dated January

---

8. AFDC is a federal program entitled "Aid for Families with Dependent Children." Being eligible for or receiving such federal aid is one determining factor for being eligible for adoption assistance in Pennsylvania.

9. See 8/15/96 Adjudication of Attorney Examiner Katrina Dunderdale, FOF No. 11 at C.R. at 176; see also testimony of Gruzinski at C.R. at C51.

10. Tim O'Hanlon testified on the legal aspects of adoption assistance as an expert who was involved in adoption services in Ohio and who has written a book on the subject of adoption assistance.

11. For example, CYS presented testimony and then represented in its Request for Reversal that Birth Mother's parental rights had either not been terminated at all or were terminated by a Connecticut agency, when, in fact, Birth Mother's parental rights were terminated by the Beaver County trial court.

7, 1997, reversing its original order and denying adoption assistance to Laura for two reasons: 1) that the child was not eligible for adoption assistance since CYS had located adoptive parents that did not require adoption assistance, and 2) because Gruzinski failed to present evidence that the child qualifies for adoption assistance under the regulations at 55 Pa.Code § 3140.202(c). This appeal followed and we now reverse.

 Appellate review of an administrative order is limited to determining whether a constitutional violation, an error of law or a violation of the administrative agency procedure has occurred and whether the necessary findings of fact are supported by substantial evidence. *Northampton Convalescent Center v. Department of Public Welfare*, 550 Pa. 167, 703 A.2d 1034 (1997), *interpreting* 2 Pa. C.S. § 704. If the appellate court reverses the agency adjudication, the appellate court cannot award relief which could not have been awarded by the lower tribunal or agency. *Northampton, citing In re Leopardi*, 516 Pa. 115, 123, 532 A.2d 311, 315 (1987) (*interpreting* 42 Pa.C.S. § 706, relating to the disposition of appeals, and

its effect on appeals brought under the Administrative Agency Law).

This Court has undertaken a full and complete review of the entire certified record.[12] In doing so, it was noted that the Secretary of DPW, in making the Final Order, did not accompany the Final Order with a separate opinion.[13] In some circumstances, such a situation would require a remand to the agency for more specific findings or reasonings in order to produce effective appellate review. However, in the instant matter, remand is not necessary.[14] Although a more detailed opinion would have made appellate review in this instance more economical, the record before us is sufficient to permit effective appellate review.

While all sectors of the necessary findings and reasons are not conveniently contained in one document, DPW, as an agency, has entered into the record, in separate documents, its findings of facts and the basis upon which their Final Order was entered. The apparent absence of a logical chain of events from the facts to the conclusion is missing in the Final Order, thus rendering that Final Order illogical, contrary to law, contrary to the administrative regulations, and contrary to reason.[15]

12. There is no Reproduced Record. It was necessary to organize the disheveled certified record into an intelligible format in order to make an effective appellate review.

13. The Director of DPW's Bureau of Hearings and Appeals certified that the record transmitted to this Court was complete, including an opinion of the agency, in accordance with Pa. R.C.P. No.1925. While the Final Order containing that opinion, in the form of two paragraphs may not be as verbose as other opinions tend to be, it does clearly contain the legal reasoning for the decision.

14. We find the guidance of the Pennsylvania Supreme Court in *Bowman v. Department of Environmental Resources*, 549 Pa. 65, 700 A.2d 427 (1997) persuasive in outlining effective appellate review:

The function of the [appellate] court is to assure that the agency has given reasoned consideration to all material facts and issues. This calls for insistence that the

agency articulate with reasonable clarity its reasons for decision, and identify the significance of the crucial facts. The court must not be left to guess as to the agency's findings or reasons. Consequently, the Commission should draft its opinion so that the logical chain from the facts to the conclusions was complete. *Bowman*, at 549 Pa. at 73, 700 A.2d at 431, *citing Boston Television Corp. v. FCC*, 143 U.S.App. D.C. 383, 444 F.2d 841 (D.C.Cir.1970).

15. It is noteworthy that DPW consistently chooses to delegate, within its own department, the function of fact finder to a different individual than the final adjudicator. DPW, through its Attorney Examiner, reviewed the testimony taken and evidence collected by the Hearing Officer during the Fair Hearing process and, on behalf of DPW, entered Findings of Fact and a Recommendation into the record. The 8/15/96 Adjudication of Attorney Examiner Katrina Dunderdale, containing the

On appeal Gruzinski asserts that DPW erred in its decision as a matter of law because 1) the child meets all of the criteria for adoption assistance under the Pennsylvania regulations; 2) CYS originally wrongfully denied adoption assistance benefits by requiring that only those children who were actually placed by CYS to be eligible for adoption assistance, in contravention of U.S. Department of Health and Human Services' (DHHS) Policy Interpretation Question (PIQ) PIQ 87–05;[16] 3) Gruzinski presented such substantial evidence of eligibility for Adoption Assistance, that DPW's own Attorney Examiner found substantial evidence to enter such

Findings of Fact and Recommendation by DPW in this instance, was published on the letterhead of DPW. In addition, the Adjudication indicates that the Attorney Examiner prepared not only the Recommendation, but the initial 9/25/96 Order of DPW, approving Adoption Assistance, which Order was signed by Edgar L. Yost, Official in charge, Bureau of Hearings and Appeals of DPW.

The 9/25/96 Order of DPW granting Adoption Assistance benefits (which was later reversed on reconsideration by the Secretary of the DPW) indicates that, "The Appellant is hereby advised that in the event it takes issue with this Adjudication, Recommendation and Order, an appeal may be taken therefrom to the Commonwealth Court of Pennsylvania . . . ."

We note that the 9/25/96 Order of DPW granting benefits (which was later reversed on reconsideration), is marked "Corrected Order," yet DPW does not indicate either in the record or in its brief what was "corrected" in the order. We, therefore, accept the "Corrected Order" as it appears on the face of the document.

In DPW's Final Order on the Merits, DPW does not apparently revise, alter, add or delete any other facts from DPW's facts originally found by DPW's Attorney Examiner on 8/15/96 since DPW received no further evidence between the time of the 8/15/96 Adjudication and the Final Order.

Absent any language to the contrary in its Final Order, this Court accepts those facts found by DPW by its Attorney Examiner on 8/15/96 as the facts of record upon which its decision is based. In accordance with the direction of the Pennsylvania Supreme Court, this Court, has, however, reviewed the entire certified record to meet the scope of review standard regarding substantial evidence.

findings into the record and to recommended Adoption Assistance be granted the Gruzinskis; and 4) prior to the reconsideration, and without taking any further evidence and without a basis for denying benefits the DPW found substantial evidence to support granting benefits and there is no substantial evidence in the record to support a denial of benefits.

## I. Placement in an Appropriate Home

DPW asserts that adoption assistance must be denied where "an appropriate" adoptive home was available where adoption assistance payments would not be needed.

This is consistent with the Pennsylvania Supreme Court's holding that a fact finder in an administrative proceeding is required to set forth his findings in an adjudication and that adjudication must include all findings necessary to resolve the issues raised by the evidence and which are relevant to a decision. *Page's Department Store v. Velardi*, 464 Pa. 276, 287, 346 A.2d 556, 561 (1975). In this instance, all such facts are contained in, and this Court has cited to, the Certified Record (C.R.).

DPW's Final Order was signed by the Secretary of DPW herself. While the Final Order does not on its face set forth the facts relied upon by the Secretary of DPW in making this decision, the 10/4/96 Order Granting Reconsideration to CYS, again signed by the Secretary of DPW, herself, states that, "After receipt of the response [of the adoptive Gruzinski], the record in this matter will be reviewed in its entirety, and a Final Order will be entered." Therefore, the entire record as this Court has received it, was reviewed and serves as the basis for DPW's Final Order.

In some circumstances, it would be more appropriate to remand a case to the administrative agency for more specific determinations. However, in the instant case, the record is complete, including specific findings by DPW. The fact that within DPW the fact finding responsibility is delegated to a different individual than the final adjudicator is no different from reviewing the transcript of a trial where a jury deliberated the evidence and found the facts while a judge entered the final adjudication.

16. PIQ 87–05 is the *Policy Interpretation Question* of the U.S. Department of Health and Human Services, Administration for Children and Families, Log No. ACF–PIQ–87–05, Issued 12/17/87, regarding, "State Adoption

■ DPW has misinterpreted the federal law in this area. Based upon the federal government's official interpretation of the federal regulations of this program, this court holds that the local agency must first find, not just "an appropriate" adoptive home, but must *first "locate the most suitable* family for the child," without regard for whether or not the most suitable family does or does not require any form of assistance.[17]

■ DPW fails to recognize the entire purpose for the Adoption Assistance Program (Program).[18] The Program was designed to promote the "best interests of the child" principle by *first* locating *the most suitable family* and *then* determining whether or not adoption assistance is appropriate. DHHS has determined therefore, for the administration of its own program through the States, that whether or not adoption assistance is required by a family is *not* a criteria for determining the most suitable family for placement.

Therefore, in accordance with the regulations at 55 Pa.Code § 3130.36 relating to the administration of the various counties' Children and Youth Services agencies, the direction that, "[t]he county shall actively seek ways to promote the adoption assistance program as set forth in Chapter 3140 Subchapter C (relating to adoption assistance)" requires that CYS utilize all

available federal policy interpretations if it enables a greater number of adopted children to benefit from this federally funded program. In this instance, we adopt the federal policy interpretations PIQ 87–05 and PIQ 92–02 as being indicative of the standard required of state and federal law on adoption assistance.

## II. Jurisdiction

■ Beaver County is the appropriate site for Gruzinski to apply for Adoption Assistance. During Laura's residence in Connecticut and Ohio, prior to the final decree of adoption, Laura was still under the jurisdiction of the Beaver County Court and Birth Mother's parental rights had not been terminated. When Birth Mother voluntarily terminated her parental rights, the termination agreement was reviewed by the court in Beaver County. The petition for adoption was also filed with the Beaver County Court, which subsequently entered the decree.

Further, in accordance with 55 Pa.Code § 3140.202(a), Pennsylvania Department of Human Services (DHS) issued a policy interpretation which stated that, in Pennsylvania, the sole and final determination of the eligibility for a child's Adoption Assistance subsidy is made by county agencies in the county of a Birth Mother's permanent residence.[19] Based upon the testimony of Gruzinski's expert, Tim

Subsidy Requirements" (PIQ 87–05). C.R. at C146–48.

17. "Once … placement with a certain family would be the most suitable for the child, then full disclosure should be made of the child's background, as well as known and potential problems. If the child meets the State's definition of special needs with regard to specific factors or conditions, then the agency can pose the question of whether the prospective adoptive parents are willing to adopt without a subsidy. *If the prospective adoptive parents say that they cannot adopt the child without a subsidy, [then] the agency would meet the requirement in 473(c)(2)(B) that there was a reasonable, but unsuccessful, effort to place the child without providing adoption assistance."* (Emphasis added.) DHHS ACF–PIQ–92–02, Issued June 25, 1992 at p. 2. (C.R. at C150.)

18. The Adoption Assistance Program was started in Pennsylvania in response to a series of Federal regulations passed by the United Sates government in which the United States government would provide financial assistance to a state which promulgated regulations consistent with the Federal regulations. In response to the available Federal funding, Pennsylvania promulgated regulations at 55 Pa.Code §§ 3140.201–210. See also, n. 1, *supra.*

19. Pennsylvania Department of Human Services' response to a survey on adoption subsidy programs conducted by the North American Council on Adoptable Children. (Answer to question 15 at C.R. at C158), interpreting 55 Pa.Code § 3140.202(a) which states, "the county children and youth social service agency is the sole authority for certifying a child's eligibility for adoption assistance."

O'Hanlon, the DHS interpretation appears to be based upon a Commonwealth issued caseworker's guide which in turn reflects the definition of "eligible child" and "local authorities", as defined for the adoption subsidy program in Pennsylvania's Adoption Opportunities Act.[20]

Laura first became eligible for Adoption Assistance after Birth Mother's parental rights were terminated on November 9, 1989 since at that time, Laura continued to be under court supervision of the Beaver County Juvenile Probation Department. The Beaver County trial court adjudicated Laura a dependent child, kept her under court supervision with her placement with the Morrisons, never relinquished their court supervision of Laura while they reviewed the termination of parental rights and did not relinquish their supervision of this child until the trial court eventually issued the final adoption decree on December 6, 1989.

 Based upon the testimony of the CYS representatives at the Fair Hearing, the CYS officials confused and conflated the agency's responsibility for children under its care with its responsibility for certifying a child's eligibility for Adoption Assistance under 55 Pa.Code § 3140.202(a). In Pennsylvania, the county agency is responsible for determining the Adoption Assistance eligibility not only for children who are in their care and custody, but for *all children.* Children may be eligible for Adoption Assistance if they are under the supervision of any county institution district, including the county courts. In order to promote the purposes of the Adoption Opportunities Act, other children who are not in the care of a public agency, the types of private placement children dis-

cussed in DHHS PIQ 87–05 may also be eligible for this federally funded program.

### III. CYS Wrongfully Denied Assistance Benefits by Requiring Only Children Actually placed by CYS Eligible for Adoption Assistance.

Where the definition of an "eligible child" in 62 P.S. § 772 would preclude any child who is otherwise eligible under the federal program guidelines from being denied federal benefits under Title IV–E because a child was not in the care, custody or control of the state, the definition is contrary to the federal law and the federal program guidelines which fund the Adoption Assistance program.

Specifically, DHHS states in its Policy Interpretation Question PIQ 87–05 that,

Title IV–E does not require that States, in all cases, have responsibility for placement and care (or custody) of a child as a prerequisite to adoption assistance under the Federal program. Further, *there are no title IV–E provisions which would allow States to attach eligibility requirements for adoption assistance under that title in addition to those cited in the Federal statute.*

. . . .

. . . State *statutes which limit access* to the Title IV–E Adoption Assistance Program *by the addition of* eligibility *requirements beyond* those required under the Federal *statute are not in conformance with title IV–E.* The Act establishes the eligibility criteria in section 473(a)(2) as the sole criteria. It does not set forth the listed criteria as minimums or as examples of eligibility criteria.

The eligibility requirements for the Adoption Assistance Program are found

**20.** The Adoption Opportunities Act, Act of June 13, 1967, P.L. 131, *as amended,* 62 P.S. §§ 771–774, describes the purpose of this act as encouraging and promoting the placement in *adoptive homes of children who are physi*cally and/or mentally handicapped, emotionally disturbed, or hard to place by virtue of age, sibling relationship, or ethnicity. The term "eligible child" is defined as "a child in the legal custody of local authorities where parental rights have been terminated pursuant to the procedure set forth in ... the Adoption Act." Local authorities are defined as "county institution districts or their successors."

in section 473(a)(2) of the Act. While this section references the requirements of the title IV–A AFDC program, the title IV–E foster care program, and the title XVI SSI program, it does not specify, in addition, that a child must be under the legal custody or responsibility of the title IV–E administering agency, through commitment or relinquishment to be eligible for title IV–E adoption assistance. While it is necessary for a child to be under the responsibility of the State agency in order to be eligible for title IV–E foster care (section 472(a)(2) requirement), there will be other situations in which children with special needs are in care under the responsibility of private, non-profit agencies without the involvement of the State agency. When adoption is the goal for such children, and they are determined to be AFDC- or SSI-eligible, the title IV–E agency may not exclude them from consideration or approval, if they are otherwise found eligible for adoption assistance in accordance with section 473. If a State does *not* have responsibility for placement and care of the otherwise eligible child, the child may be eligible for title IV–E adoption assistance under any of the following circumstances:

1. *At the time the adoption petition is filed, the child is eligible for AFDC while living with a specified relative* (section 473(a)(2)(a)(I));

2. The child meets the eligibility requirements for the SSI program prior to the finalization of the adoption (section 473(a)(2)(A)(ii));

3. The AFDC-eligible child is placed in foster care through a voluntary placement agreement (or relinquishment) with a private, non-profit agency (no title IV–E payment is made) and a judicial determination is subsequently made (following an initiation of court proceedings within six months of removal of the child from the home of a relative) to the effect that continuation in the home would be contrary to the welfare of the child. This action would satisfy the requirements in section 473(a)(2)(A)(i) and 473(a)(2)(B)(ii)(II) and the child would be considered judicially removed.

In any of the above circumstances, the adoption assistance agreement must be negotiated between the prospective adoptive parents and the State title IV–E agency, with the involvement of other relevant agencies, as appropriate (section 475(3)). (Emphasis added.)

*Policy Interpretation Question,* Log No. ACF–PIQ–87–05, U.S. Dep't Health and Human Services, Administration for Children and Families, Issued December 17, 1987 (PIQ 87–05).

■ Laura meets the requirements specified in PIQ 87–05. At the time the adoption petition was filed, Laura was eligible for AFDC while living with a specified relative, her aunt, the adoptive mother, Kathy Jo Gruzinski. Laura, in fact, received AFDC payments while living with the Gruzinskis prior to the adoption, even though actual payments are not necessary in order to meet the AFDC relatedness standard for Title IV–E adoption assistance. 42 U.S.C. § 673(a)(2)(B) indicates that a child meets the AFDC relatedness requirement if (i) AFDC payments had been made or (ii) the child would have been eligible to receive AFDC payments "had application been made . . . ."

The purpose of DHHS PIQ 87–05, like all federal Policy Interpretations, is to interpret existing federal law. The 1987 PIQ 87–05 was issued well in advance of Laura's finalized adoption in 1989. In this instance, both CYS and DPW seem reluctant to apply the federal law and official interpretations thereunder to a federally funded program. We find no basis in the law that they can make a decision that is contrary to the Federal Policy Interpretations while administering monies provided by the Federal government.

## IV. Under the Federal Policy Interpretation, the Child meets the test for "Extenuating Circumstances"

Adoption Assistance is usually granted at the time of the adoption. Here, Gruzinski did not apply for Adoption Assistance until 1995, six years after the adoption. DHHS PIQ 92–02 sets forth some grounds on which an adopted child's eligibility for adoption assistance should be reconsidered after the adoption has been finalized. One of these situations for reconsideration includes a "failure to advise adoptive parents of the availability of adoption assistance" as an "extenuating circumstance" that may entitle the child to a reconsideration of eligibility.

■ Laura and her adoptive family should not be penalized because the Gruzinskis never had a legitimate chance to apply for adoption assistance before finalization, especially since CYS had a duty to notify the original prospective adoptive parents, the Morrisons, of Laura's eligibility for adoption assistance and failed to do so.[21]

Federal rules, specifically 45 C.F.R. § 1356.40(f) require state agencies to "ac-tively seek ways to promote the adoption assistance program." See also 55 Pa.Code § 3130.36(b)(2) (the county shall actively seek ways to promote the adoption assistance program as set forth in Chapter 3140).

DHHS PIQ 92–02 was issued to allow children such as Laura an avenue of redress when the local agency fails in its obligation to promote the program.[22] This is specifically addressed in PIQ–92–02 which sets forth that, "it is the responsibility of the fair hearing officer to determine whether extenuating circumstances exist and whether the applicant or recipient was wrongly denied eligibility." (C.R. at C152.)

■ This case meets the federal criteria for extenuating circumstances cited in DHHS PIQ 92–02 and this Commonwealth and the local agency should be bound by the federal guidelines and should welcome the opportunity to provide this much needed and deserved entitlement. Most importantly, however, CYS and DPW are bound by the determination of the Fair Hearing officer, who found Laura eligible.

---

21. Because Laura was in temporary foster care when the Beaver County trial court placed Laura with the Morrisons, under 55 Pa.Code § 3130.36, regarding CYS' duty to provide adoption services, the regulation requires the county agency to make adoption services available to a child who is in custody or temporary or substitute care of the agency and who cannot be returned to his own home.

CYS has interpreted their duties under this regulation at Section 3130.36 to end upon the private placement or court placement of a child in their care or custody. Neither this regulation nor any statute points to this interpretation. On the contrary, as the "administrator" of the federally funded adoption assistance program, as well as numerous other federal and state programs, CYS has a duty under Section 3130.36 to pursue all the listed adoption services for any child placed with them temporarily or permanently, even after the child is privately placed.

This interpretation is evident by the language of Section 3130.35(b)(1) "Adoption Service. Activities designed to culminate in legal adoption of a child ... and in adoption assistance, when needed," along with the language in Section 3130.36(a) which states, "[t]he county agency shall make adoption services available to a child in the custody or ... who is in the temporary or substitute care and who cannot be returned home." (Emphasis added.)

The language does not indicate that the administration of the adoption services end upon the county agency's relinquishment of care or custody. The language indicates that the adoption services are to be pursued until such activities "culminate in legal adoption."

22. PIQ 92–02 states that "State notification to potential adoptive parents about its existence is an intrinsic part of the program and the incentive for adoption that was intended by Congress. Thus, notifying potential adoptive parents is the State agency's responsibility in its administration of the Title IV–E adoption assistance program. Accordingly, the State agency's failure to notify the parents may be considered an 'extenuating circumstance' which justifies a fair hearing."

■ PIQ 92–02 further outlines the earliest date from which adoption assistance may be provided after the legalization of an adoption. In this instance, because the adoption was finalized after October 1, 1986, adoption assistance payments may be granted when the child is placed in the adoptive home, even prior to a final decree of adoption. This is true in this instance even for retroactive payments.[23]

### V. The Child Meets All of the Criteria for Adoption Assistance Under the Pennsylvania Regulations [24] and DPW's reversal of its Order Granting Benefits is Not Based on Substantial Evidence and Capriciously Disregards the Only Facts Found of Record

A child is eligible for Adoption Assistance in Pennsylvania 1) if the ultimate goal for that child is adoption [25] and 2) if:

1. The child is 17 years of age and younger; [26]

2. The parental rights have been terminated under the Adoption Act of the Domestic Relations Code (Adoption Act); [27]

3. The child is in the legal custody of the county agency or another agency approved by the Department; [28]

4. The child has one of five special need characteristics, including a physical condition or handicap.[29]

55 Pa.Code § 3140.202.

Two additional factors must be present before a child is eligible for adoption assistance:

1. The child's removal from the home is the result of a judicial determination that continuation in the home is contrary to the child's welfare, or there is a voluntary placement agreement; [30] and

2. At the time the petition which seeks removal from the home was filed, or the voluntary placement agreement was signed, the child met the Aid for Families with Dependent Children (AFDC) relatedness test.[31]

55 Pa.Code § 3140.205.

■ The Certified Record indicates that Laura meets all of the criteria for eligibility of adoption assistance, which is consistent with the determination of the Fair Hearing Officer, Attorney Examiner Katrina Dunderdale. (C.R. at C174–180.)

23. See Response to Question 8, PIQ 92–02; C.R. at C153–4. PIQ 92–02 indicates that the Adoption Assistance Agreement should be backdated to the earliest date of eligibility for the child and that the two-year restriction in section 1132(a) of the Social Security Act would not apply in this situation.

24. While eligibility to receive adoption assistance in Pennsylvania is governed by the regulations promulgated by the DPW at 55 Pa. Code § 3140.202, additionally, the regulations at 55 Pa.Code § 3140.205 set forth the criteria by which adoption assistance payments made by the state will qualify for Federal financial participation under Title IV–E. See n. 1, supra.

25. CYS terminated Laura's temporary foster care and sought adoption for her, thus meeting the first criteria of "adoption being the ultimate goal for the child." (CYS 10/18/85 letter to Morrisons; C.R. at C161.)

26. Laura was born on November 25, 1984 and is currently 14 years old.

27. Parental rights were terminated in Beaver County trial court. See Note 5, supra.

28. See this court's determination in accordance with PIQ 87–05 in Section III, herein, where Laura meets these criteria by being under the supervision of the county trial court.

29. Laura's physical handicap of cleft palate, jaw and lip were never at issue and her status as a special needs child is uncontested.

30. Laura was removed from her Birth Mother on November 28, 1984, by order of the trial court because of the Birth Mother's inability to care for her. Laura was further adjudicated dependent on January 4, 1985 by the trial court.

31. Here, there was a voluntary placement from the Morrisons to the Gruzinskis and as soon as Laura began living with the Gruzinskis she was eligible for and received AFDC benefits.

The Federal program guidelines as interpreted by PIQ 92–02 indicate that DPW and CYS are bound by the determination of the Fair Hearing officer, for which we find substantial evidence in the record and in the law to support that determination. Laura meets the eligibility requirements of the Adoption Assistance program; there are sufficient extenuating circumstances to enforce such eligibility *nunc pro tunc* as provided under the federal and Commonwealth regulations. The Commonwealth Department of Public Welfare and the Beaver County Children and Youth Services is the proper forum to administer the benefits.

Therefore, we conclude that Laura is eligible for Title IV–E adoption assistance retroactive to the first instance where Laura was residing with the adoptive mother *and* the Birth Mother's parental rights were terminated, which date is December 10, 1989.[32]

In accordance with the attached order, we instruct the Department of Public Welfare and the Beaver County Children and Youth Services to provide Laura Gruzinski with all available adoption assistance for which she was and is eligible, retroactively back to December 10, 1989.

### ORDER

NOW, June 7, 1999, the order of the Secretary of the Department of Public Welfare, dated January 7, 1997, No. 69–95–004, is reversed and the Department of Public Welfare is ordered to enforce the payment of all available adoption assistance benefits on behalf of Laura Lynn Gruzinski retroactive to December 10, 1989, in accordance with the opinion issued herein.

Judge LEADBETTER dissents.

**32.** In accordance with criteria set forth at PIQ 92–02, Response to Question 8; C.R. at

Concurring opinion by Judge FRIEDMAN in which Judge PELLEGRINI joins.

FRIEDMAN, Judge, concurring.

I cannot join the opinion of the majority because I believe that the issues discussed in Parts II through IV have not been raised. However, based on Parts I and V of the majority opinion and this court's decision in *Barczynski v. Department of Public Welfare*, 727 A.2d 1222 (Pa.Cmwlth. 1999), I concur in the result.

Judge PELLEGRINI joins in this concurring opinion.