# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Blair County Children, Youth and : 
Families, : 
              Petitioner : 
  : 
       v. : No. 1073 C.D. 2016
  : Submitted: February 24, 2017
Department of Human Services, : 
            Respondent : 

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
               HONORABLE JULIA K. HEARTHWAY, Judge
               HONORABLE DAN PELLEGRINI, Senior Judge

**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**          **FILED: June 21, 2017**

Blair County Children, Youth and Families (BCCYF) petitions for review of an Order of the Department of Human Services (Department), which ordered it to pay an adoption subsidy to Ronald J. and Lori A. Kirsch (the Kirsches), who adopted B.K. after BCCYF originally placed the child in their care. On appeal, BCCYF argues that the Kirsches were not eligible for the subsidy because B.K.'s placement goal was subsidized permanent legal custodianship (SPLC), not adoption, at the time of BCCYF's involvement and because the Kirsches did not enter into an adoption subsidy agreement prior to the adoption being finalized, as required by the applicable regulations. Further, BCCYF claims that no extenuating circumstances exist that would excuse the Kirsches' late request for the subsidy.

Lastly, BCCYF asserts that, in the event, the Kirsches are found to be entitled to a subsidy, Cambria County is the proper county to be responsible for paying the subsidy, as that is where the child resides and where the adoption was finalized. Having reviewed the record, we find substantial evidence exists to support the Department's decision and therefore affirm.

The parties have largely stipulated to the facts of this case. B.K. was born February 1, 2003, to T.L.K., her biological mother, and S.W., her biological father. She has four biological siblings and half-siblings, all of whom were previously declared dependent in Blair County. On September 18, 2007, B.K. was also declared dependent by the Blair County Court of Common Pleas, and BCCYF was granted physical and legal custody. B.K. and two siblings were placed with the Kirsches, as foster parents, on May 15, 2009, after being transferred from another foster home. Although B.K.'s permanency goal was previously adoption, it was changed to SPLC shortly before her placement with the Kirsches.[1]

At a 38th month Permanency Review, SPLC for B.K. with the Kirsch family was finalized, and court and BCCYF supervision ended on August 23, 2010. Prior to the finalization of SPLC, the Kirsches entered into a subsidy agreement for permanent legal custodianship with BCCYF. Since August 23, 2010, B.K. has

---

[1] The biological mother's parental rights were involuntarily terminated by the Blair County Court of Common Pleas on August 31, 2009. The biological father's parental rights, at that time, were intact, and he still had an ongoing relationship with B.K., which is the reason adoption was not the goal. Under Section 6351(a)(2.1) of the Juvenile Act, 42 Pa. C.S. § 6351(a)(2.1), a court can award permanent legal custody of a child to a caretaker without terminating parental rights. In fact, the court order to this effect may include temporary visitation rights of the parents. *Id.* Court intervention and supervision by a county agency ceases once SPLC is awarded. *In re S.H.*, 71 A.3d 973, 977 (Pa. Super. 2013).

remained in the physical and legal custody of the Kirsches, who reside in Cambria County.

In February 2011, the Kirsches, through counsel, sought to terminate the biological father's parental rights through proceedings in Cambria County. BCCYF was not a party to the proceeding, but a representative of BCCYF was subpoenaed and testified at the termination hearing. Biological father's parental rights were terminated on September 5, 2012. Shortly thereafter, the Kirsches filed an adoption petition in Cambria County, and Professional Family Care Services, Inc. of Johnstown completed the required home study. On November 27, 2012, the adoption was finalized. BCCYF did not learn of the adoption being finalized until the spring of 2013 when it contacted the Kirsches to conduct its annual subsidy survey related to B.K.'s SPLC. No adoption assistance agreement for B.K. was executed prior to the adoption of B.K. being finalized.

The Kirsches subsequently requested an adoption subsidy from BCCYF, but the request was denied. The Kirsches then appealed to the Bureau of Hearings and Appeals (Bureau). Following a hearing, an administrative law judge (ALJ) recommended the Kirsches' appeal be denied, concluding that because B.K.'s placement goal was SPLC at the time BCCYF's involvement ended, BCCYF was not obligated to advise the Kirsches about the availability of the subsidy. In addition, the ALJ concluded that extenuating circumstances did not exist to excuse the Kirsches' failure to enter into an adoption subsidy agreement prior to finalization of the adoption. Lastly, the ALJ concluded that Cambria County, not Blair, was the correct county agency to certify the child for adoption, as that is where the child resided and where the adoption took place. The Bureau adopted the ALJ's recommendation in its entirety on January 7, 2015. The Kirsches filed a

3

Petition for Reconsideration, which was granted. Upon reconsideration, the Department set aside the Bureau's order that found BCCYF was not responsible for paying the adoption subsidy. The Secretary of Human Services (Secretary) found that BCCYF was aware of B.K.'s placement with the Kirsches, as well as the proceedings to terminate the biological father's parental rights. Because the county agency has the duty to notify potential adoptive parents of the subsidy, which BCCYF did not do, the Secretary ordered BCCYF to coordinate and provide adoption assistance to the Kirsches. It is from this order that BCCYF appeals.[2]

The adoption assistance at issue is made available to parents that adopt special needs children through state and federal law. Section 473 of the Federal Adoption Assistance and Child Welfare Act, 42 U.S.C. § 473, requires each state to enact its own program to provide adoption assistance. In response, Pennsylvania enacted the Adoption Opportunities Act[3] with its purpose "to encourage and promote the placement in adoptive homes of children who are physically and/or mentally handicapped, emotionally disturbed, or hard to place by virtue of age, sibling relationship, or ethnicity." Section 771 of Adoption Opportunities Act, 62 P.S. § 771.

Regulations promulgated by the Department set forth a county children and youth agency's duties and responsibilities, as well as the eligibility requirements.

---

[2] On appeal, our review is limited to determining whether the Department's decision is supported by substantial evidence, is in accordance with the law, or whether constitutional rights were violated. *Myers v. Dep't of Human Servs.*, 141 A.3d 608, 611 n.9 (Pa. Cmwlth. 2016). While the ALJ serves as fact-finder, and both the Department and our Court are bound by those factual determinations, so long as they are supported by substantial evidence, neither the Department nor this Court is bound to accept the ALJ's conclusions of law. *Lehmann v. Dep't of Pub. Welfare*, 30 A.3d 580, 585 (Pa. Cmwlth. 2011).

[3] Act of June 13, 1967, P.L. 31, added by Section 1 of the Act of December 30, 1974, P.L. 1039, 62 P.S. §§ 771-774.

First, they provide that the county agency is the "sole authority" for certifying a child's eligibility. 55 Pa. Code § 3140.202(a); *see also Gruzinski v. Dep't of Pub. Welfare*, 731 A.2d 246, 254 (Pa. Cmwlth. 1999) ("In Pennsylvania, the county agency is responsible for determining the Adoption Assistance eligibility not only for children who are in [its] care and custody, but for **all children**.") (emphasis in original). The regulations further provide that "[t]he county agency shall certify for adoption assistance children **whose placement goal is adoption**" and who meet the certain requirements, which are not at issue here. 55 Pa. Code § 3140.202(b) (emphasis added).

Here, BCCYF contends B.K.'s placement goal was not adoption but was SPLC, and, therefore, she is not eligible for adoption assistance. We, however, do not read this regulation as narrowly as BCCYF does, particularly in light of prior case law and the overarching goal of permanency in child placement. In cases of private adoption, the county agency has no placement goal because it is not involved. Yet, our Supreme Court has made clear that adoption subsidies are available even in private adoptions. *Laird v. Dep't of Pub. Welfare*, 23 A.3d 1015, 1028 (Pa. 2011). If our courts have allowed subsidies even in cases where there was **no** county agency involvement, we cannot find a subsidy is not owed simply because an agency that is involved has not designated adoption as the goal but selected a different placement goal. This is especially true when a court subsequently finds it is in the child's best interest to allow the adoption, despite the agency's recommendation, which is what occurred here. This approach is consistent with a goal of children and youth social services in Pennsylvania, which is "to ensure for each child in this Commonwealth a permanent, legally assured family which protects the child from abuse and neglect." 55 Pa. Code § 3130.11.

5

Therefore, a child who has been placed by a county agency is eligible for an adoption subsidy, even if the county agency's placement goal is not adoption, so long as the child otherwise meets the eligibility requirements and is subsequently adopted.

Having concluded B.K. is an eligible child, which would entitle the Kirsches to an adoption subsidy, we now address whether the failure to enter into an adoption assistance agreement prior to the adoption being finalized is fatal to the Kirsches' claim. The regulations provide that a "**county agency shall execute** a binding written adoption assistance agreement between the parties **--** prospective adoptive parents and county agency **-- at the time of or before the court issues the final adoption decree**." 55 Pa. Code § 3140.203(a) (emphasis added). However, our courts have allowed for an adoption subsidy, even after the adoption is finalized, where there are extenuating circumstances. Our Court first adopted the extenuating circumstances doctrine in *Gruzinski*, and our Supreme Court applied the doctrine in *Laird*. A county agency's failure to advise adoptive parents of the availability of adoption assistance has been recognized as an extenuating circumstance. *Laird*, 23 A.3d at 1029. This is because, in part, the county agency has an affirmative duty to promote adoption assistance. *See* 55 Pa. Code § 3130.36(b)(2) ("The county shall actively seek ways to promote the adoption assistance program.").

Here, it is undisputed that BCCYF and the Kirsches did not enter into an adoption assistance agreement related to B.K. prior to the adoption being finalized. The Kirsches contend extenuating circumstances exist here because they were never notified by BCCYF of the availability of the subsidy at the time they were adopting B.K. BCCYF asserts it did not have a duty to advise the Kirsches of the

6

subsidy for two reasons. First, it argues it no longer had jurisdiction over the child and was unaware of the adoption proceedings. In support, BCCYF relies heavily upon the Supreme Court's decision in *Laird*. In that case, children were placed with a private adoption agency after their biological mothers voluntarily relinquished their parental rights and placed the children with the private agency. The children's subsequent adoptions were handled entirely by a private agency, and the children were never declared dependent to bring them under the umbrella of the court or county agency. It was not until the parents sought adoption assistance several years after the adoption that the county agency learned of the children's existence. The Court reiterated that "whether an adoption is public or private, **a county adoption agency has affirmative statutory and regulatory duties** it must undertake prior to the consummation of an adoption." *Laird*, 23 A.3d at 1030 (emphasis added). However, when the agency does not know of the existence of the child prior to finalization of the adoption, the Court found no duty existed. *Id.* It based its decision on federal policy guidelines, which provide:

> [I]n circumstances where the State agency does not have responsibility for placement and care, or is otherwise unaware of the adoption of a potentially special needs child, it is incumbent upon the adoptive family to request adoption assistance on behalf of the child. It is not the responsibility of the State or local agency to seek out and inform individuals who are unknown to the agency about the possibility of [] adoption assistance for special needs children who also are unknown to the agency.

*Id.* at 1031 (quoting Department Policy Statement, ACYF-CB-PA-01-01 (January 23, 2001)).

Unlike *Laird*, however, here, B.K. was adjudicated dependent and BCCYF had legal and physical custody of her for nearly three years until the court approved SPLC with the Kirsches. Furthermore, although it was not a party to the

7

parental rights termination proceeding, which was part of the adoption process, a representative of BCCYF was subpoenaed and testified as to why termination proceedings were not undertaken in Blair County. Therefore, BCCYF cannot claim ignorance of the existence of B.K., like the county agency could in *Laird*, nor can BCCYF claim ignorance of the adoption proceedings. Thus, under the facts of this case, neither reason excuses BCCYF's duty to notify the Kirsches of the adoption subsidy.

Second, BCCYF argues it had no duty to advise the Kirsches of the subsidy because the Kirsches were already aware of the subsidy's existence through Mrs. Kirsch's former employment with a private adoption agency, from the agency that did the home study, and from their earlier adoption of B.K.'s sibling, in which they received the subsidy. However, **the county agency has an affirmative duty** to promote the subsidy and to advise prospective parents of the availability of the subsidy. 55 Pa. Code § 3130.36(b)(2). BCCYF did not fulfill its duty. Therefore, the Secretary correctly stated that "[n]otifying potential adoptive parents of the Adoption Assistance Program is the responsibility of the state agency and its administration. The record establishes that no state agency offered the Kirsches adoption assistance for which they were eligible." (June 7, 2016 Final Order.) BCCYF was aware of B.K.'s placement with the Kirsches and was present at the proceedings to terminate the rights of the biological father. Therefore, BCCYF should have notified the Kirsches. This is particularly true given that the Kirsches were receiving a subsidy by virtue of a subsidy agreement executed with BCCYF with regard to their permanent legal custodianship of B.K, which would cease upon their adoption of B.K. Whether or not the Kirsches may have fortuitously been aware of the general availability of adoption subsidies does not relieve the

8

county agency of its responsibility. Therefore, in this situation, the Department did not err in finding that extenuating circumstances exist which excuse the Kirsches' late request for the subsidy.

Because B.K. is an eligible child and extenuating circumstances exist for the late application for an adoption subsidy, we must examine BCCYF's last issue – which county agency is ultimately responsible for the subsidy. BCCYF argues that the ALJ correctly decided it should be Cambria County's obligation, as that is where the child has resided since 2007 and where she resided when the adoption was finalized. BCCYF directs this Court to a bulletin from the Department's Office of Children, Youth, and Families (OCYF) for support. Specifically, it cites Question 17 of OCYF Bulletin 3140-99-01, which provides that if a child had been adopted and was receiving a subsidy but then relocates to another county when the adoption resolves and the child is placed in a new adoptive home, that the county agency where the child currently lives is responsible for the subsidy.[4] That is not the situation we have here. After being placed with the Kirsches by BCCYF, B.K. was not removed from their home and placed into a new home by Cambria County. Cambria County's agency never had any involvement with B.K.

We find the guidance found in Question 1 of the OCYF Bulletin more persuasive. It provides that when a child in the custody of a private agency is being placed for adoption, either the county where the birth parent(s) with whom the child was living **when the child was placed** in the custody of the private agency or the county where the child was located **when taken into custody**, if the child was abandoned or the parents are unknown, is responsible for the subsidy. Although B.K. was not in the custody of a private agency at any time, her adoption

_____

[4] The OCYF Bulletin is appended to BCCYF's brief as Exhibit E.

9

was not overseen by a county agency. Furthermore, if the birth parents' county of residence or the county where the child was located when taken into custody are factors when a private agency is involved, it follows that they should also be factors when a county agency is involved. These factors also focus on the time period that the child was placed or taken into custody by the agency. While it is not known where the biological parents resided when B.K. was taken into custody and/or placed with the Kirsches,[5] because BCCYF initially took custody of B.K., at a minimum, B.K. was located in Blair County at that time. It bears emphasis that BCCYF was the county agency that originally took custody of B.K., placed her with the Kirsches, and initiated action to terminate the biological mother's parental rights, whereas at no time did Cambria County Children and Youth participate in the case. Because of BCCYF's involvement in this case, we find it is the proper agency responsible for the adoption subsidy.

Based upon the foregoing, we find that the Kirsches are eligible for an adoption subsidy for the adoption of B.K. and that their failure to enter into an adoption assistance agreement prior to finalizing the adoption is excused by extenuating circumstances. Furthermore, because BCCYF is the county agency ultimately responsible for B.K.'s placement with the Kirsches, it, not Cambria County, is responsible for the subsidy. Accordingly, we affirm the Department's Order.

**RENÉE COHN JUBELIRER,** Judge

---

[5] It is possible the biological mother resided in Blair County because that is where her parental rights were terminated. Venue for involuntary termination proceedings is proper in, *inter alia*, the county where the biological parent whose rights are being terminated resides. Section 2302 of the Adoption Act, 23 Pa. C.S. § 2302.

10

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Blair County Children, Youth and : 
Families, : 
      Petitioner : 
 : 
    v. :  No. 1073 C.D. 2016
 : 
Department of Human Services, : 
     Respondent : 

## **O R D E R**

   **NOW**, June 21, 2017, the June 7, 2016 Order of the Department of Human Services is **AFFIRMED**.

             _____

             **RENÉE COHN JUBELIRER,** Judge