ALLEGHENY COUNTY OFFICE
OF CHILDREN, YOUTH AND
FAMILIES, Petitioner,

v.

DEPARTMENT OF PUBLIC
WELFARE, Respondent.

Commonwealth Court of Pennsylvania.

Argued May 7, 2002.
Decided June 7, 2002.

Jocelyn Banks, Pittsburgh, for petitioner.

Amy Jardine Wilson, Pittsburgh, for respondent.

Timothy S. Lijewski, Pittsburgh, for intervenor, M. Foster.

BEFORE: LEADBETTER, Judge, and LEAVITT, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Senior Judge McCLOSKEY.

The Allegheny County Office of Children, Youth and Families (CYF) petitions for review of a final order on the merits issued by the Secretary of the Department of Public Welfare (DPW), upholding an order of DPW's Bureau of Hearings and Appeals (BHA), which in turn sustained the request of Megan Foster for retroactive adoption subsidy payments on behalf of her adopted son, Brandon Foster, dating back to his pre-adoptive placement with Mrs. Foster and her husband on or about July 29, 1987. We now affirm as modified.

Brandon was born on April 16, 1987. He is of mixed racial descent. On July 29, 1987, CYF placed Brandon in the home of Megan and John Foster. Pursuant to an adoption decree entered by the Orphan's Court Division of the Court of Common Pleas of Allegheny County on October 5, 1989, the Fosters adopted Brandon. At this time in 1989, if an adopting family's income exceeded certain amounts, it was uniform practice among CYF adoption caseworkers not to discuss adoption subsidy payments with that family. In 1989, the Fosters household income was approximately $45,000.00 per year and exceeded these amounts. Hence, CYF did not discuss such subsidies with the Fosters.

In 1992, the Fosters were considering the placement and adoption of another child, a two-year old African–American girl named Brittany. Mrs. Foster contacted a CYF caseworker regarding the potential for adoption subsidy payments with the addition of another child to the household. Based upon this addition, as well as the Fosters' reported household income of $38,000.00 per year at that time, the CYF caseworker determined that the Fosters would be eligible for only a clothing allowance and a medical assistance card. Brittany was placed in the Fosters' home on January 13, 1993. During the course of home visits in 1993 by CYF caseworker D. Stephan Glenn, Mrs. Foster reported some behavioral difficulties with Brandon both at home and particularly at school.[1] In early 1997, the Fosters advised Mr. Glenn that Brandon's behavioral difficulties had escalated, his school performance had declined and that he had a number of special needs. Mr. Glenn advised Mrs. Foster to contact Kathy Leahy, CYF's adoption manager, to see if there was anything CYF could do to assist her with Brandon's problems.

By letter to Ms. Leahy dated April 8, 1997, Mrs. Foster indicated that at the

---

1. At some point in 1996, the Fosters moved their family to Florida after Mr. Foster obtained a new job.

time of Brandon's adoption, neither she nor her husband were informed of Brandon's special needs. Through various evaluations, Mrs. Foster indicated that she and her husband learned of these needs, including that Brandon suffered from attention deficit disorder (ADD). Hence, Mrs. Foster requested the return of "full subsidy and medical assistance that terminated at his adoption." [2] (Mrs. Foster's April 8, 1997, Letter to Kathy Leahy).[3] CYF denied Mrs. Foster's request. The Fosters appealed this denial to DPW's BHA and a hearing was scheduled before Katrina L. Dunderdale, a BHA regional manager.

However, prior to this hearing, the parties opted to stipulate to the facts and submit the case on briefs. In a Stipulation executed in March of 1998, the parties agreed that Brandon was of mixed racial descent, that he was placed in the Fosters home on July 29, 1987, and was subsequently adopted on October 5, 1989. The parties also agreed that Brandon has been diagnosed with ADD and that he is eligible for adoption subsidy payments based upon his special needs and his bi-racial origin until such time as he attains the age of eighteen. Further, the parties agreed that Brandon was eligible to receive these payments retroactive to Mrs. Foster's request for the same, i.e., April 8, 1997.

In June of 1998, Ms. Dunderdale issued a recommended adjudication and order directing CYF to pay the Fosters adoption subsidy payments retroactive to October 5, 1989, the date of Brandon's adoption. By final order dated July 1, 1998, the Director of BHA affirmed Ms. Dunderdale's recommended adjudication and order. CYF requested reconsideration, which was granted by the Secretary of DPW. On reconsideration, the Secretary upheld in part and remanded in part. Specifically, the Secretary remanded the matter to the BHA to accept evidence and testimony regarding if or when CYF informed Mrs. Foster of the availability of adoption subsidy payments. The Secretary further directed BHA to determine if Mrs. Foster is entitled to receive such payments prior to the date of her application for the same, i.e., April 8, 1997.

The case was thereafter reassigned to Ms. Dunderdale and a hearing was conducted on January 8, 2001. At this hearing, Mrs. Foster testified on her own behalf, relating a history of events as described above. Mrs. Foster indicated that as of the date of the hearing, she had not received any adoption subsidy payments or clothing allowances for Brandon, nor was he currently covered by medical assistance. Mrs. Foster also indicated that Brandon was in need of a psychiatric evaluation, which she was unable to get because of a lack of medical insurance.

CYF presented the testimony of Mary Anne Gorman, a supervisor in its adoption department since 1993. Ms. Gorman was involved with Brandon and the Fosters since she was assigned to conduct a home study in April of 1989. Ms. Gorman indicated that back in 1989, when discussing adoption with a family whose household income was "over a certain amount," they did not discuss adoption subsidy payments. (N.T., Hearing of January 8, 2001, p. 55). Ms. Gorman also indicated that Brandon received foster care placement subsidies and medical assistance during his place-

---

2. During the period beginning with Brandon's placement with the Fosters on July 29, 1987, to his adoption on October 5, 1989, the Fosters received foster care subsidies and medical assistance through CYF and DPW.

3. The reproduced record in this case is not properly numbered. Hence, we will refer to the original documents when necessary.

ment in the Fosters' home prior to his adoption. Upon questioning from Ms. Dunderdale, Ms. Gorman indicated that under the current adoption procedures, if Brandon was only now being adopted, CYF would discuss adoption subsidy payments with the Fosters. Ms. Gorman explained that the Fosters income would no longer have a bearing on the discussion of these types of payments, but would only affect the amount of such payments.

CYF also presented the testimony of Mr. Glenn. As noted above, Mr. Glenn came into contact with the Fosters in 1993, in the course of placement and the ultimate adoption of Brittany by the family. Mr. Glenn indicated that at that time, Brittany was eligible for adoption subsidy payments based upon her African American descent. Mr. Glenn indicated that during the course of his home studies, Mrs. Foster indicated that she was having some behavioral problems with Brandon, that these problems had escalated and that he advised her to contact Ms. Leahy. Ultimately, Ms. Dunderdale issued another recommended adjudication and order directing CYF to pay the Fosters adoption subsidy payments retroactive to the date of Brandon's placement, i.e., July 29, 1987, and continuing until he attains the age of majority. By final administrative action order dated March 9, 2001, the Director of BHA affirmed the recommended adjudication and order of Ms. Dunderdale. By

final order on the merits dated August 1, 2001, the Secretary of DPW upheld the same. CYF thereafter filed a petition for review with this Court.[4]

■ On appeal,[5] CYF argues that Secretary/BHA erred as a matter of law in ordering CYF to pay adoption subsidy payments to the Fosters retroactive to the date of Brandon's placement with the Fosters, i.e., July 29, 1987. We agree insofar as the order directs CYF to make such payments prior to the date of Brandon's adoption by the Fosters.

■ The Federal Adoption Assistance and Child Welfare Act of 1980 (Federal Act),[6] an amendment to Title IV E of the Social Security Act, provides for adoption assistance for "special needs" children.[7] In accordance with the Federal Act, each state is required to enact its own program to administer adoption assistance.[8] The purpose of the applicable state law, commonly referred to as the Adoption Opportunities Act (State Act),[9] is to promote placement of children who are physically and/or mentally handicapped, emotionally disturbed or difficult to place by virtue of their age, sibling relationship or ethnicity.[10] Under the State Act, adopting families may apply for financial assistance on behalf of children with such special needs, provided that the children meet the follow-

---

**4.** Subsequently, Mrs. Foster filed a notice of intervention with this Court.

**5.** On appeal from a final administrative order, our scope of review is limited to determining whether legal error has been committed, whether constitutional rights have been violated or whether necessary findings of fact are supported by substantial evidence. *B.E. v. Department of Public Welfare,* 654 A.2d 290 (Pa.Cmwlth.1995).

**6.** 42 U.S.C. §§ 670–676.

**7.** These "special needs" refer to certain medical, mental health and/or rehabilitative care. *See* 42 U.S.C. § 671(a)(21).

**8.** 42 U.S.C. § 673.

**9.** The Public Welfare Code, Act of June 13, 1967, P.L. 31, *added by* Section 1 of the Act of December 30, 1974, P.L. 1039, *as amended,* 62 P.S. §§ 771–774.

**10.** *See* 62 P.S. § 771.

ing eligibility standards contained in DPW regulations (state regulations): [11]

Child Eligibility

(a) The county children and youth social service agency (county agency) is the sole authority for certifying a child's eligibility for adoption assistance.

(b) The county agency shall certify for adoption assistance children whose placement goal[ [12]]is adoption and who meet the following requirements:

(1) The child is 17 years of age or younger.

(2) Parental rights have been terminated....

(3) The child is in the legal custody of the county agency or another agency approved by the Department.

(4) The child shall have at least one of the following characteristics:

(i) A physical, mental or emotional condition or handicap.

(ii) A genetic condition which indicates a high risk of developing a disease or handicap.

(iii) Be a member of a minority group.

(iv) Be a member of a sibling group.

(v) Be 5 years of age or older.

(c) Prior to certification for adoption assistance, the county agency shall make reasonable efforts to find an adoptive home without providing adoption assistance. Evidence of this effort shall be recorded in the case record and include registration with the Department's adoption exchange for at least 3 months.

(d) If it would be against the best interests of the child because of factors, such as the existence of significant emotional ties with prospective adoptive parents while in the care of the parents as a foster child, the requirement of subsection (c) does not apply.

55 Pa.Code § 3140.202.[13]

If a child meets the criteria of this regulation, his or her eligibility is certified by

**11.** These state regulations, found at 55 Pa. Code §§ 3140.201–210, are sometimes referred to as the Adoption Assistance Program. This Program was started in Pennsylvania in response to a series of federal regulations passed by our United States government in which the government would provide financial assistance to a state which promulgated regulations consistent with the federal regulations. This Program is managed and partially funded by individual county children and youth services agencies, under the supervision of DPW.

**12.** Pursuant to the state regulations, the local county children and youth agency must establish a family service plan and goal prior to the placement of a child in its care. *See* 55 Pa.Code §§ 3130.61, 3130.67. The plan shall identify the child and other family members and describe the circumstances of the case, the objectives for the family and the services to be provided to the family. 55 Pa.Code § 3130.61(b)(1)-(4). The goal for the child must be one of six options, i.e., return to home, placement with another relative, adop-

tion, placement with a legal guardian, independent living or long-term placement. 55 Pa.Code § 3130.67(b)(9)(i)-(vi).

**13.** The state regulations further provide that the county agency shall execute a binding written adoption assistance agreement between the agency and the prospective adopting parents at the time of or before the court issues the final adoption decree. 55 Pa.Code § 3140.203(a). If, however, a request for adoption assistance is denied and such an agreement is not signed and in effect at the time of or prior to the finalization of the adoption, the adopting parents may request a fair hearing under Section 671(a)(12) of the Federal Act, 42 U.S.C. § 671(a)(12), provided there are extenuating circumstances. An example of an "extenuating circumstance" is the failure of a county children and youth services agency to provide information to adoptive parents concerning the availability of adoption assistance/subsidy payments. *See Gruzinski v. Department of Public Welfare*, 731 A.2d 246 (Pa.Cmwlth.1999), *petition for allowance of appeal denied*, 561 Pa. 661, 747

the county children and youth services agency, which will then determine the terms and amount of adoption assistance/subsidy payments. *See* 55 Pa.Code §§ 3140.203–04; *see also Ward v. Department of Public Welfare*, 756 A.2d 122 (Pa. Cmwlth.2000). These payments are provided by the county children and youth services agency, subject to reimbursement by the federal government and/or the state. Furthermore, these payments are usually granted as of the date of the adoption. *See Gruzinski.*

In this case, there is no dispute that Brandon met the child eligibility standards in the state regulations. Specifically, CYF's goal for Brandon was adoption, his natural parents' rights had been terminated, he is bi-racial and he has "special needs" such as requiring care for his mental condition of ADD.[14] The only question remains as to the duration of the Fosters' entitlement to retroactive payments. The state act and state regulations require that parental rights be terminated in order for a child to be eligible for adoption subsidy payments. *See* 62 P.S. § 772, 55 Pa.Code § 3140.202(b)(2). The evidence of record in this case indicates that Brandon's natural parents' rights were not terminated until March 29, 1989. Hence, Brandon

and the Fosters were not eligible for these payments prior to this time.

Nor is there a dispute that, at the time of Brandon's adoption, CYF failed to even discuss the possibility of these payments with the Fosters. CYF admits the same in its brief to this Court. (Brief of CYF at 19). As noted above, adoption subsidy payments are usually granted as of the date of the adoption and the state regulations provide that the county agency "shall execute a binding written adoption assistance agreement" with the prospective adoptive parents "at the time of or before the court issues the final adoption decree."[15] *See Gruzinski;* 55 Pa.Code § 3140.203(a). In addition, the state regulations provide that an eligible child shall begin to receive such payments "when an adoption assistance agreement is in effect under § 3140.203...." *See* 55 Pa.Code § 3140.204(d).

Based upon the unique facts of this case, as well as the state act and state regulations cited above, we believe that Ms. Dunderdale's original recommended adjudication and order in June of 1998, directing CYF to pay the Fosters adoption subsidy payments retroactive to October 5, 1989,

A.2d 902 (1999), *citing* Policy Interpretation Question (PIQ), Log No. ACF–PIQ–92–02, U.S. Department of Health and Human Services (DHHS), Administration for Children and Families, Issued June 25, 1992. In response to questions regarding the application of Title IV E and the Federal Act, DHHS issued a series of PIQ's to answer these questions.

14. We reiterate that in their 1998 Stipulation, the parties agreed that Brandon was eligible for adoption subsidy payments, as he was "a bi-racial child" with "special needs," including the fact that he has been diagnosed with ADD. (Stipulation of Facts, executed March 12 and 16, 1998, respectively, Nos. 6–7). Admittedly, Brandon was not diagnosed with ADD until several years after his adoption.

However, such fact does not render Brandon ineligible for these payments. To the contrary, Brandon was of mixed racial descent, i.e., a member of a minority group, and the state regulations simply require that a child have one qualifying characteristic.

15. Moreover, we note that the evidence of record in this case indicates that from the time of Brandon's placement in the Fosters' home until the date of his adoption, the Fosters received a foster care placement maintenance subsidy. Both the state act and the state regulations provide that the amount of adoption subsidy payments shall not exceed the amount of the foster care placement maintenance subsidy. *See* 62 P.S. § 774, 55 Pa.Code § 3140.204(b)(1)(i).

the date of Brandon's adoption, was appropriate.[16] Thus, we must modify the Secretary's final order on the merits so as to reflect the Fosters' entitlement to retroactive payments as of this date and not the date of Brandon's placement with the Fosters.

■ Next, CYF argues that certain findings of fact in the BHA adjudication are not supported by evidence in the record, i.e., findings regarding Brandon's adoption subsidy eligibility factors at the time of placement with the Fosters, cessation of Brandon's medical assistance upon the Fosters move to Florida and CYF's denial of adoption subsidy payments in 1989 to adopting families with incomes in excess of $35,000.00 annually. We agree but conclude that such findings do not affect the outcome of this case.

The first finding at issue relates to the BHA's statement that "both" of Brandon's eligibility factors, i.e., he is a member of a minority group and he suffers from a mental condition, ADD, existed prior to his placement and adoption by the Fosters. This fact was discussed above, wherein we noted that the ADD condition was not diagnosed until several years after Brandon's adoption but was only one of two characteristics rendering Brandon eligible for adoption subsidy payments. As the state regulations only require one characteristic for eligibility, this misstatement by the BHA does not affect our determination above.

The next finding at issue relates to the BHA's statement that CYF terminated Brandon's medical assistance upon his family's move to Florida. There is no dispute that CYF was in no way responsible for providing or terminating said medical benefits at that time as CYF had errantly not even certified Brandon for any type of adoption subsidy payments. Nevertheless, we fail to see how this misstatement affects the ultimate determination of this case.

The final finding at issue relates to the BHA's statement that CYF's policy in 1989 did not permit payment of adoption assistance subsidy payments when the adopting parents had income exceeding $35,000.00 per year. Admittedly, the record lacks any evidence or testimony establishing such a $35,000.00 per year threshold. Nevertheless, such misstatement appears to be harmless as CYF admitted in its brief to this Court that it had a uniform policy in 1989 to not discuss such payments with adopting families whose income exceeded certain amounts and that the CYF caseworker did not, in fact, discuss such payments with the Fosters. *See* Brief of CYF at 19.

Accordingly, the Secretary's final order on the merits is affirmed as modified.

### *ORDER*

AND NOW, this 7th day of June, 2002, the final order on the merits issued by the Secretary of the Department of Public Welfare is affirmed as modified, consistent with this opinion.

---

16. Our conclusion above is limited to the unique facts of this case and does not preclude future determinations that retroactive adoption subsidy payments may be ordered prior to the date of an eligible child's adoption, e.g., when a county agency and prospective adoptive parents agree to modify the goal of a family service plan from reunification of the child with his/her natural parents to adoption.