**YORK COUNTY CHILDREN AND YOUTH SERVICES,**
Petitioner,

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Aug. 1, 2003.
Decided Oct. 1, 2003.

Maria Musti Cook, York, for petitioner.

Stuart S. Sacks, Harrisburg, for intervenor, R.Rogos.

Before COLINS, President Judge, LEAVITT, J., and KELLEY, Senior Judge.

OPINION BY Senior Judge KELLEY.

York County Children and Youth Services (CYS) petitions for review of an order of the Department of Public Welfare (DPW) which affirms the order of DPW's Bureau of Hearings and Appeals (Bureau) sustaining the appeal of R.C.R., on behalf of his adopted daughter, H.R., from the

denial by CYS of R.C.R's request for adoption assistance.[1] We affirm.

As explained by this Court on previous occasions,[2] the Federal Adoption Assistance and Child Welfare Act of 1980 (Federal Act),[3] an amendment to Title IV–E of the Social Security Act, provides for adoption assistance for "special needs" children.[4] In accordance with the Federal Act, each state is required to enact its own program to administer adoption assistance.[5] The purpose of the applicable state law, commonly referred to as the Adoption Opportunities Act[6] (State Act), is to promote placement of children who are physically and/or mentally handicapped, emotionally disturbed or difficult to place by virtue of their age, sibling relationship, or ethnicity.[7] Under the State Act, adopting families may apply for financial assistance on behalf of children with such special needs, provided that the children meet the following eligibility standards contained in DPW regulations (state regulation):[8]

Child eligibility.

(a) The county children and youth social service agency (county agency) is the sole authority for certifying a child's eligibility for adoption assistance.

(b) The county agency shall certify for adoption assistance children whose placement goal is adoption and who meet the following requirements:

(1) The child is 17 years of age or younger.

(2) Parental rights have been terminated under 23 Pa.C.S. Part III (relating to the Adoption Act).

(3) The child is in the legal custody of the county agency or another agency approved by the Department.

(4) The child shall have at least one of the following characteristics:

(i) A physical, mental or emotional condition or handicap.

(ii) A genetic condition which indicates a high risk of developing a disease or handicap.

(iii) Be a member of a minority group.

(iv) Be a member of a sibling group.

(v) Be 5 years of age or older.

(c) Prior to certification for adoption assistance, the county agency shall make reasonable efforts to find an adoptive home without providing adoption assistance. Evidence of this effort shall be recorded in the case record and include registration with the Department's adoption exchange for at least 3 months.

---

1. DPW filed a notice of non-participation with this Court on July 16, 2003. R.C.R. filed an application for intervention which was granted by this Court on July 7, 2003; therefore, R.C.R. is the participating respondent in this appeal.

2. See Allegheny County Office of Children, Youth and Families v. Department of Public Welfare, 800 A.2d 367 (Pa.Cmwlth.2002) and Adoption ARC, Inc. v. Department of Public Welfare, 727 A.2d 1209 (Pa.Cmwlth.1999).

3. 42 U.S.C. §§ 670–676.

4. 42 U.S.C. § 671.

5. 42 U.S.C. § 673.

6. The Public Welfare Code, Act of June 13, 1967, P.L. 31, as amended, added by Section 1 of the Act of December 30, 1974, P.L. 1039, 62 P.S. §§ 771–774.

7. 62 P.S. § 771.

8. These state regulation, found at 55 Pa.Code §§ 3140.201–210, are sometimes referred to as the Adoption Assistance Program. This program is managed and partially funded by individual county children and youth services agencies, under the supervision of DPW.

(d) If it would be against the best interests of the child because of factors, such as the existence of significant emotional ties with prospective adoptive parents while in the care of the parents as a foster child, the requirement of subsection (c) does not apply.

55 Pa.Code § 3140.202.[9]

With the foregoing in mind, we turn to the instant case. By letter of April 12, 2002, R.C.R. formally appealed to the Bureau for adoption assistance. An administrative hearing was held on November 26, 2002, before an administrative law judge (ALJ). The only issue before the ALJ was whether R.C.R. was entitled to adoption assistance for H.R. in accordance with 55 Pa.Code § 3140.202(b)(4)(i), specifically, whether H.R. had a physical, mental, or emotional condition or handicap at the time of her adoption. The facts, as found by the Bureau's ALJ, are as follows.

H.R. is a female child who was born on April 25, 1987. R.C.R. is the adoptive father and W.B. is the adoptive mother of H.R. H.R. was placed with R.C.R. and W.B. in December 1990. The Court of Common Pleas of York County terminated the parental rights of H.R.'s biological parents on May 1, 1991. R.C.R. and W.B. adopted H.R. on October 7, 1991.

Before H.R.'s adoption, she was a dependent child in the custody of CYS. H.R. resided in several foster placements and had been the victim of physical abuse and possible sexual abuse perpetrated by her biological mother.

In 1990, Gilbert M. Foley, Ed.D., conducted a clinical evaluation of H.R. and found H.R. to have developmental problems. Dr. Foley recommended play therapy. The Lincoln Intermediate Unit conducted a diagnostic evaluation of H.R. on February 21, 1990.

In January and February 1991, H.R. was evaluated by Allen Greenstein, Ph.D., clinical psychologist. H.R. was found to have attained a "certain degree of emotional stability and a very strong sense of attachment with her current foster placement." Dr. Greenstein also reported that H.R.'s foster mother, W.B., noted "no occurrence of any abhorrent or aberrant behavior." Dr. Greenstein agreed, however, that H.R. was a victim of abuse and neglect, and that she was struggling to maintain her stability. W.B. spoke with Dr. Greenstein at the conclusion of his evaluation of H.R. and was given a brief verbal summary of his findings.

Suzanne Rowe Piccolo, a former adoption caseworker with CYS, met with R.C.R. and W.B. before H.R.'s adoption. Ms. Piccolo advised R.C.R. and W.B. of H.R.'s history including various placements and abuse. Ms. Piccolo also gave R.C.R. and W.B. H.R.'s medical and social background information. R.C.R. and W.B. were not able to read the actual medical records of H.R. but instead were given a summary of the information. Around the time of the adoption, W.B. visited CYS to review H.R.'s social history.

**9.** The state regulations further provide that the county agency shall execute a binding written adoption agreement between the agency and the prospective adoptive parents at the time of or before the court issues the final adoption decree. 55 Pa.Code § 3140.203(a). If, however, a request for adoption assistance is denied and such an agreement is not signed and in effect at the time of or prior to the finalization of the adoption, the adopting parents may request a fair hearing under Section 671(a)(12) of the Federal Act, 42 U.S.C. 671(a)(12), provided there are extenuating circumstances. An example of an extenuating circumstance is the failure of a county agency to provide information to adoptive parents concerning the availability of adoption assistance/subsidy payments. *Allegheny County Office of Children, Youth and Families.*

Ms. Piccolo could not remember specifically whether or not the records of Dr. Greenstein, Dr. Foley and the Lincoln Intermediate Unit were given or made available to R.C.R. and W.B. before H.R.'s adoption. R.C.R. and W.B. did not see the aforementioned reports until a week or so before the hearing before the Bureau's ALJ on November 26, 2002.

Ms. Piccolo advised R.C.R. and W.B. of the availability of adoption subsidy assistance before the finalization of the adoption. This discussion concerned the availability of "normal counseling." W.B. did not understand what the "program adoption subsidy is." Ms. Piccolo did not realize that H.R. had a "really bad disorder" but that H.R. needed "some counseling."

On July 3, 1991, R.C.R. and W.B. decided that they were not interested in adoption assistance. This decision was based on the family's health insurance that covered H.R.'s ordinary health needs. No adoption subsidy agreement was entered into between CYS and R.C.R. and W.B.

H.R. began individual therapy sessions with Rebecca Sorrow, Ph.D, in November 2000 and continued to see Dr. Sorrow until December 2001. Dr. Sorrow diagnosed H.R. as having "Oppositional Defiant Disorder." Dr. Sorrow also related H.R.'s "behavioral issues" back to the first three years of H.R.'s life. Dr. Sorrow stated that given H.R.'s history of abuse and early signs of "distrust" during the first three years of H.R.'s life, a diagnosis of "Reactive Attachment Disorder of Early Childhood" would have been appropriate. Dr. Sorrow stated that "Reactive Attachment Disorder of Early Childhood" and "Oppositional Defiant Disorder" are both recognized mental conditions recognized in the DSM–IV.

None of the psychologists who observed H.R. during the first three years of her life made a diagnosis of "Reactive Attachment Disorder." Between 1996 and 1999, H.R. received psychological therapy at various times and places. The testimony of W.B. is credible.

Based on the foregoing findings of fact, the ALJ determined that R.C.R. was entitled to adoption assistance for H.R. The ALJ opined that CYS did not provide meaningful notice to R.C.R. and W.B. of H.R.'s overall mental and emotional background or provide to R.C.R. and W.B. relevant information contained in the numerous social and medical reports. The ALJ found that even though the contact notes show that adoption assistance was discussed and R.C.R. and W.B. decided not to request assistance, CYS failed to provide them with a meaningful understanding of the adoption assistance program available at the time of H.R.'s adoption. The ALJ concluded that CYS's failure to provide relevant medical information regarding H.R's mental and emotional condition and the need for treatment and therapy entitled R.C.R. to a fair hearing and determination that he was wrongly denied benefits at the time of H.R.'s adoption.

The ALJ concluded further that without such meaningful notice to prospective adoptive parents, adoptions of hard to place children would be severely hampered and that such meaningful notice is consistent with the intent behind the promulgation of the adoption assistance program and encourages placement of children with special needs. In addition, the ALJ noted that such notice places the burden of adequate disclosure upon CYS and not the adoptive parents. The ALJ also determined that the record supported a determination that H.R. had a mental or emotional condition or handicap before she was adopted by R.C.R. and W.B.

Accordingly, the ALJ sustained R.C.R.'s appeal and further directed CYS to enter

into an adoption assistance agreement with R.C.R. The ALJ directed that the agreement grant assistance benefits retroactive from October 7, 1991, to include non-recurring adoption costs and continuing monthly cash benefits until H.R. reaches the age of eighteen years or R.C.R. no longer fulfills the requirements set forth in 55 Pa.Code § 3140.204(e).[10] DPW affirmed the ALJ's order and this appeal by CYS followed.[11]

CYS presents four issues for our review:

1. Whether DPW erred in determining that H.R. had a "mental or emotional handicap" as set forth in 55 Pa.Code § 3140.202(b)(4)(i), at the time H.R. was adopted;

2. Whether DPW erred in accepting the diagnosis of Reactive Attachment Disorder for H.R. at age three years, when said diagnosis was made retrospectively by the expert, and the expert testified that she did not have an opportunity to evaluate H.R. until she was thirteen years old;

3. Whether DPW erred in determining that CYS failed to provide H.R.'s family with a "meaningful understanding" of the adoption assistance program and with relevant medical information regarding H.R.'s mental and emotional condition; and

4. Whether DPW erred in determining that H.R. is entitled to retroactive adoption assistance effective October 7, 1991, because CYS failed to anticipate H.R.'s need for future treatment and therapy and where the parents failed to present evidence of any expenditures prior to 1996, to support their appeal.

In support of this appeal, CYS first argues that the ALJ erred in accepting the diagnosis that H.R. suffered from Reactive Attachment Disorder at or before the time of her adoption because this diagnosis was made retrospectively. CYS contends that the experts who evaluated H.R. at or before the adoption did not make a diagnosis of Reactive Attachment Disorder. Since these experts did not make such a diagnosis, the ALJ erred in relating H.R.'s current problems back to the time prior to the adoption. In addition, Dr. Sorrow, the expert who diagnosed H.R. with Reactive Attachment Disorder admitted that she did not evaluate H.R. until she was thirteen, ten years after the age Dr. Sorrow was asserting the diagnosis existed, which violated the professional requirements to make such a diagnosis.

CYS contends that Dr. Sorrow indicated that in order to make such a diagnosis, a psychologist is required to observe behavior patterns of the child and her interactions with others at the time the diagnosis is asserted, as well as having knowledge that the child had a pathogenic environment early in life, which would include severe abuse and neglect or multiple placements and caretakers. CYS argues that Dr. Sorrow admitted that she did not make the required observations of H.R. at age three and the experts that did observe

---

**10.** Section 3140.204(e) of Title 55 of the Pennsylvania Code provides that adoption assistance payments and benefits shall be terminated by the county agency when the child reaches eighteen years of age, the adoptive parents are no longer providing for the financial support of the child, the parents are determined by court action to no longer be legally responsible for the child, or the adoptive parents request termination of adoption assistance.

**11.** This Court's standard of review of a decision by DPW is limited to a determination of whether DPW's adjudication is supported by substantial evidence, is in accordance with the law or whether constitutional rights were violated. *Nolan v. Department of Public Welfare*, 673 A.2d 414 (Pa.Cmwlth.1995), *petition for allowance of appeal denied*, 546 Pa. 650, 683 A.2d 887 (1996).

H.R. at a young age did not make such a diagnosis. Therefore, CYS contends, the ALJ improperly accepted the diagnosis of Reactive Attachment Disorder and incorrectly found that H.R. had a "mental or emotional handicap" as set forth in 55 Pa. Code § 3140.202(b)(4)(i), at the time H.R. was adopted.

■ Initially, we note that CYS appears to be challenging the competency of Dr. Sorrow's testimony. However, a review of the transcript of the November 26, 2002 hearing before the ALJ reveals that CYS did not object to Dr. Sorrow's competency to testify as to whether H.R. suffered from Reactive Attachment Disorder at or before the time of H.R.'s adoption. Moreover, Dr. Sorrow's testimony supports the ALJ's finding that H.R. suffered from a "mental or emotional handicap" as set forth in 55 Pa.Code § 3140.202(b)(4)(i), at the time H.R. was adopted. Dr. Sorrow testified that she reviewed H.R.'s medical history, information from H.R.'s adoptive parents, and conducted thirty-seven individual therapy sessions. Based on this information, Dr. Sorrow opined that the diagnosis of Reactive Attachment Disorder of early childhood would have been appropriate. Reproduced Record (R.R.) at 36a. When asked what kind of evaluation it takes to render a diagnosis of Reactive Attachment Disorder, Dr. Sorrow did testify as follows:

> A. For a child—a young child, it's based on observation of behavior patterns, her interaction with others; and it also requires that there has been pathogenic environment early in her life, which would include either severe abuse and neglect or multiple placement, multiple caretakers. In her case, she had both.

*Id.* But, Dr. Sorrow was also asked if she was able to make the diagnosis of Reactive Attachment Disorder based on her work with H.R. and her independent observations of H.R. *Id.* at 37a. In response, Dr. Sorrow testified that while she did not give H.R. the diagnosis of Reactive Attachment Disorder herself, based on where H.R. is now, Dr. Sorrow testified that she could certainly see that there are very significant attachment problems and that the residual effects are certainly there. *Id.* Dr. Sorrow also testified that the characteristics that H.R. shows now are consistent with the presentation of children who start out with that disorder with attachment problems. *Id.*

Accordingly, the ALJ did not err by accepting Dr. Sorrow's diagnosis that H.R. suffered from Reactive Attachment Disorder at or before the time of her adoption and by finding, based on Dr. Sorrow's testimony, that H.R. had a "mental or emotional handicap" as set forth in 55 Pa. Code § 3140.202(b)(4)(i), at the time H.R. was adopted by R.C.R. and W.B.

Next, CYS argues that it offered adoption subsidy assistance to R.C.R. and W.B. at the time of H.R.'s adoption and also offered relevant information regarding H.R.'s emotional and mental condition. CYS contends that Ms. Piccolo testified that she specifically discussed with R.C.R. and W.B. the availability of adoption assistance and they admitted that they declined the offer of assistance. CYS contends further that it provided R.C.R. and W.B. with the relevant medical information regarding H.R.'s mental and emotional condition and the need for therapy and treatment. CYS argues that the fact that the adoptive parents did not understand the adoption subsidy program does not mean that CYS failed to properly advise them.

■ Herein, the record supports the ALJ's determination that CYS did not provide meaningful notice of the adoption assistance program to the adoptive parents. Ms. Piccolo's testimony reveals that it is unclear whether CYS provided R.C.R. and

W.B. with all of the relevant facts regarding H.R.'s medical history at the time of the adoption. Ms. Piccolo testified that R.C.R. and W.B. were not given H.R.'s actual medical records to read but were given a summary. R.R. at 45a. Moreover, it is clear from Ms. Piccolo's testimony that when she discussed an adoption assistance subsidy, the conversation centered on "normal counseling" and normal kinds of circumstances. *Id.* at 39a. Ms. Piccolo testified that she had no idea that H.R. "had a really bad disorder; but just a child with that kind of background usually needs some counseling somewhere along the line." *Id.*

In addition, the ALJ found W.B.'s testimony credible that she and R.C.R. did not receive a number of important documents prior to the adoption and that they did not see the medical reports of the psychologists who evaluated H.R. prior to the adoption until a week or so before the November 26, 2002 hearing. As stated by the ALJ, these documents covered H.R.'s early childhood before her adoption and showed a significant history of abuse and the need for therapy.

■ It is the county agency's responsibility to determine whether to certify a child as eligible for assistance. *Adoption ARC, Inc.* It is not the adoptive parents' responsibility and the agency cannot expect the adoptive parents to make an informed decision as to whether or not to accept an adoption assistance subsidy when it is the agency that controls what information is and is not given to the adoptive parents. Accordingly, the ALJ did not err in determining that CYS failed to provide relevant medical information and a meaningful understanding of the adoption assistance program to R.C.R. and W.B. at the time of H.R.'s adoption.

Finally, CYS contends that DPW erred in determining that H.R. is entitled to retroactive adoption subsidy assistance. CYS contends that the ALJ erred in determining that a nexus exists between H.R.'s current condition and any behaviors she exhibited or conditions she suffered from prior to the adoption. CYS argues that a retroactive application is not warranted under the facts of this case. We disagree.

■ As noted herein, the state regulations provide that the county agency shall execute a binding written adoption agreement between the agency and the prospective adoptive parents at the time of or before the court issues the final adoption decree. 55 Pa.Code § 3140.203(a). If, however, a request for adoption assistance is denied and such an agreement is not signed and in effect at the time of or prior to the finalization of the adoption, the adopting parents may request a fair hearing under Section 671(a)(12) of the Federal Act, 42 U.S.C. 671(a)(12), provided there are extenuating circumstances. An example of an extenuating circumstance is the failure of a county agency to provide information to adoptive parents concerning the availability of adoption assistance/subsidy payments. *Allegheny County Office of Children, Youth and Families.*

■ In the instant case, there clearly are extenuating circumstances which justify the retroactive application of an adoption subsidy. The ALJ found, based on the expert medical testimony of Dr. Sorrow, that H.R. suffered from a "mental or emotional handicap" as set forth in 55 Pa. Code § 3140.202(b)(4)(i), at the time H.R. was adopted. The ALJ also found that R.C.R. and W.B. were not given a meaningful understanding of the adoption assistance program and relevant medical information prior to the adoption. Thus, DPW properly ordered CYS to enter into an adoption assistance agreement with R.C.R. and that the agreement shall grant assis-

tance benefit retroactive from October 7, 1991.

Accordingly, DPW's order in this matter is affirmed.

## ORDER

AND NOW, this 1st day of October, 2003, the order of the Department of Public Welfare in the above captioned matter is affirmed.