**GREENE COUNTY CHILDREN AND YOUTH SERVICES, Petitioner**

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 17, 2006.

Decided Nov. 28, 2006.

Reconsideration or Reargument Denied En Banc Jan. 23, 2007.

Gregory C. Hook, Waynesburg, for petitioner.

Sally L. Apter, Waynesburg, for intervenor.

BEFORE: COLINS, President Judge, SMITH–RIBNER, Judge, COHN JUBELIRER, Judge.

OPINION BY Judge SMITH–RIBNER.

Greene County Children and Youth Services (CYS) seeks review of a final administrative action order of the Chief Administrative Law Judge of the Bureau of Hearings and Appeals (Bureau) of the Department of Public Welfare (Department) that affirmed an order of Administrative Law Judge (ALJ) Katrina L. Dunderdale after a remand. The ALJ largely sustained the appeal of Steve and Sandy F. (Parents) and ordered CYS to enter into an adoption subsidy agreement for their adopted daughter Michelle effective August 12, 1999 and ending on her eighteenth birthday under the applicable method for calculating reimbursement for special needs children, with a quarterly clothing allowance.

The ALJ also ordered CYS to pay the non-recurring legal expenses incurred as a result of the adoption proceedings not to exceed $4,000 and any non-reimbursed medical expenses incurred since August 12, 1999 in the identification, diagnosis and/or treatment of the child's mental or emotional condition and to provide her a Medical Assistance card. The ALJ denied payments retroactive to the date of Michelle's placement in the home as a foster child on June 22, 1998.[1]

<hr/>

1. CYS questions whether the ALJ's opinion is correct that a child may be a special needs child entitled to adoption assistance based on a finding that a handicap develops after the date of adoption; whether the evidence showing that the child currently has problems satisfies the burden to prove that she was a special needs child at the time of adoption; whether CYS is responsible for $4000 of non-recurring legal fees when regulations provide for $2000; whether payment of a per-diem from the date parental rights were terminated is correct when the adoptive family was paid the per-diem until the date of adoption;

## I

The Adoption Assistance and Child Welfare Act of 1980 (Federal Act), 42 U.S.C. §§ 670–676, provides for adoption assistance for "special needs" children. Under the Federal Act each state is required to enact its own program to administer adoption assistance. Section 771 of the state law commonly known as the Adoption Opportunities Act (State Act), Act of June 13, 1967, P.L. 31, *as amended,* added by Section 1 of the Act of December 30, 1974, P.L. 1039, 62 P.S. § 771, declares its purpose "to encourage and promote the placement in adoptive homes of children who are physically and/or mentally handicapped, emotionally disturbed, or hard to place by virtue of age, sibling relationship, or ethnicity."

Adopting families may apply for financial assistance on behalf of children with special needs, provided they meet eligibility standards in Department regulations, in particular 55 Pa.Code § 3140.202. That section provides in part:

> (b) The county agency shall certify for adoption assistance children whose placement goal is adoption and who meet the following requirements:
>
> (1) The child is 17 years of age or younger.
>
> (2) Parental rights have been terminated. . . .
>
> . . . .
>
> (4) The child shall have at least one of the following characteristics:
>
> (i) A physical, mental or emotional condition or handicap.
>
> (ii) A genetic condition which indicates a high risk of developing a disease or handicap.
>
> (iii) Be a member of a minority group.
>
> (iv) Be a member of a sibling group.
>
> (v) Be 5 years of age or older.
>
> (c) Prior to certification for adoption assistance, the county agency shall make reasonable efforts to find an adoptive home without providing adoption assistance. Evidence of this effort shall be recorded in the case record and include registration with the Department's adoption exchange for at least 3 months.

The child's eligibility under this section is certified by the county children and youth services agency, which determines the terms and amount of adoption assistance payments and makes those payments subject to reimbursement by the federal government and/or the state.

Michelle was born on April 16, 1997. CYS took custody of her and placed her as a foster care child with Steve and Sandy F. on June 22, 1998. At that time she did not walk or talk, she could not eat table food, she suffered from shigellosis (a form of diarrhea that can come from feces on hands), she refused to be placed on her feet and she sometimes had temper tantrums and was defiant. Parental rights of the birth parents to the child were terminated August 12, 1999, and Michelle made significant progress while in foster care.

CYS requested a pre-adoption child profile, which was performed by mental health therapist Bonnie Hassan and was submitted to CYS on October 5, 1999. The profile opined that at that time Michelle was developmentally on target, that she had bonded well with her foster family and that her behavior was consistent with that

---

whether a quarterly clothing allowance is required when no statutory or regulatory authority for such exists; and whether the Department violated CYS's due process rights when it remanded for further testimony, when no showing was made that the testimony was not available at the time of the original hearing.

of a normal two-year-old child. It noted also that Michelle's right foot turned out slightly and that she had asthma and had trouble with sleep and sleep-time issues. The birth family had experienced heart disease, high blood pressure, cancer, drug and alcohol abuse, suicide, mental health issues, eczema, diabetes and depression. CYS did not inform the Parents about the child profile or the adoption subsidy program; they adopted Michelle on December 17, 1999 in Greene County. On January 5, 2000 CYS provided them the child profile.

The family moved to Northumberland County in January 2000. After accepting a male foster child from that county in November 2003, they began attending weekly therapy sessions. On November 23, 2003, the Parents requested adoption assistance from Greene County CYS for Michelle, including monthly subsidy payments, a Medical Assistance card and reimbursement of adoption-related legal expenses. CYS denied the request, and they appealed. ALJ Catherine Caplan rendered an adjudication in which she found in addition to the points above that Michelle at age seven was bossy, had no friends, might cry when she did not get her way and on occasion became furious.[2]

On April 19, 2005, ALJ Caplan issued her adjudication denying the appeal, which was affirmed by Katrina L. Dunderdale, the Regional Manager of the Bureau on April 20, 2005. ALJ Caplan concluded that the only possible basis for considering Michelle to be a special needs child would be if she had a physical, mental or emotional handicap at the time of adoption. There was no evidence that CYS or the Parents considered that Michelle had such a handicap at the time of adoption. An expert in child and adolescent psychiatry did not consider incidents at age seven to

be indicative of reactive attachment disorder (RAD), and he did not think that anyone could make such a diagnosis in retrospect for Michelle on available information. ALJ Caplan found that the evidence was insufficient to show that Michelle has a physical, emotional or mental condition or that she had a physical, mental or emotional condition or handicap at adoption, and there was no evidence that she had a genetic condition indicating high risk of developing disease or handicap. Therefore, she did not meet the definition of a special needs child.

The Parents requested reconsideration, which was granted, and in an order of August 11, 2005, the Secretary of the Department set aside the Bureau's order and remanded the matter to the Bureau to reopen the hearing to accept testimony from the child's therapist and to issue a new adjudication. Licensed psychologist Cheryl Walters testified telephonically before ALJ Hoyer on September 22, 2005. Walters examined Michelle on May 7, 2004, spending an hour with Sandy F. and then half an hour with them both. She noted that the child profile included a statement that "the adoptive family will need to be sensitive to issues from her past and the effects they could have on her future." N.T. September 22, 2005, p. 41. She recounted medical and mental health problems in Michelle's birth family as indicated in the child profile. Walters stated that in May 2004 Michelle was diagnosed with generalized anxiety disorder, as having suffered some pre-verbal trauma, and with a childhood disorder not otherwise specified with attachment disorder difficulties.

ALJ Dunderdale rendered her adjudication on remand on January 26, 2006. That

2. On December 17, 2003, the Parents adopted the male foster child, who was diagnosed with reactive attachment disorder (RAD), qualifying him for adoption assistance.

decision made additional findings that Walters found within the 1999 profile signs that prior to adoption Michelle suffered from delayed development, shigellosis, malnourishment, frequent crying and difficulty sleeping. The findings on remand referred to physical and mental problems in the birth family as genetic pre-dispositions. It noted the May 4, 2004 diagnosis and found in accordance with Walters' testimony that during the examination the child exhibited traits consistent with early trauma, including a failure to trust herself and the adults around her, a lack of trust that her environment would be safe and secure, a feeling that rules are imposed by adults to be mean, generalized resentment toward authority and evidence of an attachment break with a birth parent. Further, among other things, the child has difficulty with relationships with others, which causes her confusion; she has not developed a sense of remorse or conscience appropriate for her age; she has trouble telling the truth or being able to tell the truth; and she is unwilling to be accountable for her actions. The ALJ found that the cause of the generalized anxiety and attachment disorder dates to before the adoption decree.

In her discussion, ALJ Dunderdale concluded that Michelle meets the definition of a "special needs" child under 55 Pa. Code § 3140.202(b)(4)(i) because she has a mental or emotional condition or handicap, i.e., generalized anxiety and a handicap with attachment disorder features. The ALJ rejected CYS's contention that the law requires the handicap to exist before the date of adoption, citing *Allegheny*

*County Office of Children, Youth and Families v. Department of Public Welfare,* 800 A.2d 367 (Pa.Cmwlth.2002), where a child developed Attention Deficit Disorder (ADD) after he was adopted. The ALJ stated that the therapist testified that the child's behaviors in 1999, which the foster parents perceived as typical of a two-year-old, were "red flag" behaviors indicative of some trauma or neglect early in life. The child shows precursor symptoms for reactive attachment disorder. Assessments are needed sooner rather than later to determine if the child suffers from that disorder.

The ALJ cited *Allegheny County Office of Children, Youth and Families* and *Ward v. Pennsylvania Department of Public Welfare,* 756 A.2d 122 (Pa.Cmwlth. 2000), for the proposition that the earliest date in Pennsylvania for an adoption subsidy is either the date that parental rights were terminated or the date of adoption. She ordered subsidy to begin as of the date of termination, August 12, 1999. The ALJ stated that CYS had withheld important background information from the Parents about the child's family history and about the availability of adoption assistance, and she ordered CYS to enter into the adoption subsidy agreement including subsidy payments and allowances specified above. The ALJ denied the appeal to the extent the Parents sought a subsidy retroactive to the date of placement on June 22, 1998. That decision was affirmed January 27, 2006 by Thomas E. Cheffins, Chief Administrative Law Judge of the Bureau.[3]

---

**3.** The Court's review of a final decision of the Department is limited to determining whether there was a constitutional violation or an error of law, whether a practice or procedure of the agency was not followed and whether necessary findings of fact are supported by substantial evidence. 2 Pa.C.S. § 704; *see*

Allegheny County Office of Children, Youth and Families. Substantial evidence is such evidence that a reasonable person would accept as adequate to support a conclusion. *William Penn School District v. Department of Education, Division of Food and Nutrition,* 902 A.2d 583 (Pa.Cmwlth.2006).

## II

CYS first argues that the ALJ used an incorrect legal standard as to when a handicap should exist in order for a child to be certified as a special needs child. It insists that the ALJ's statement that the regulations do not require the handicap to exist before the date of adoption and that case law has provided for a county agency to be ordered to pay assistance even for conditions or handicaps that were not known or revealed prior to adoption is contrary to *Allegheny County Office of Children, Youth and Families,* upon which the ALJ relied.

The adopted boy involved in *Allegheny County Office* was bi-racial and therefore automatically met the criterion in 55 Pa. Code § 3140.202(b)(4)(iii) for recognition as a special needs child. The county agency had not informed the adoptive parents of the possibility of subsidy at the time of his adoption. Later, after the parents adopted an African American girl and were informed of the possibility of adoption assistance, they sought it in regard to the boy who by that time had been diagnosed with ADD. The parties agreed that he was a special needs child; the only issue was whether adoption assistance payments should be retroactive to the date of his adoption.

CYS points to *York County Children and Youth Services v. Department of Public Welfare,* 833 A.2d 281 (Pa.Cmwlth. 2003), where a therapist diagnosed a child at age thirteen as having had RAD at the time of adoption. This diagnosis was based upon thirty-seven individual therapy visits, review of medical records and information from the adoptive parents. The child had resided in several foster placements, and she was the victim of physical abuse and possible sexual abuse by her biological mother. The Court determined that the testimony supported the finding that RAD existed at the time of adoption.

In the present case, CYS argues, there is no testimony from any expert diagnosing Michelle with a condition that existed at the time of her adoption, and Sandy F. stated that she was not aware of any special needs at the time of adoption. CYS contends that it was not the intent of the legislature that a county agency should pay assistance for conditions that were not known or revealed at the time of adoption, which would cause agencies to be subject to numerous claims by adoptive families having trouble with adopted children years later. CYS's closely related second argument is that the evidence showing that Michelle may now have problems did not satisfy the Parents' burden to show that their child was a special needs child at the time of adoption.

Walters made clear that the she was not providing a diagnosis for Michelle as of 1999 but only as of 2004, when she first saw Michelle. CYS cites testimony on cross-examination where Walters stated that she was not testifying that Michelle had a diagnosis of general anxiety disorder in 1999 or of a childhood disorder not otherwise specified in 1999, because Walters never met Michelle in 1999. N.T. September 22, 2005, pp. 74–75; R.R. 205a–206a. Walters' testimony that Michelle's behaviors in 1999 constituted a red flag is too speculative to support a finding that she had a physical, mental or emotional handicap at that time.

In response the Parents assert that Michelle qualifies as a "special needs" child under 55 Pa.Code § 3140.202(b)(4)(i) and also (b)(4)(ii) because there were significant medical diseases and mental disorders in the family history for two generations

back.[4] They contend that the ALJ was correct in stating that they proved through the therapist's testimony and through statements in the 1999 child profile that the diagnosis of generalized anxiety and the behaviors with marked features of attachment disorder existed at the time of adoption. They note that the parties in *Allegheny County Office* stipulated that the boy was eligible for adoption subsidy payments based on both his special needs and his bi-racial origin; they also note that in *York County Children and Youth Services* the doctor related the issues back to the first three years of the child's life even though psychologists who had observed her then did not make a diagnosis. The child there was thirteen when she began counseling.

The Parents review Walters' impressive credentials as a licensed psychologist with over 180 hours of specific attachment training and education and her professional work in this area. They note the several methods that she employed in her examination and her statement that the circumstances by which Michelle came into custody were red flags for and signs of neglect. They refer to Walters' statements that some of Michelle's anxiety disorder is based at least in part on early trauma, that some of her anxiety disorder was prevalent even before she was placed in a secure home in 1999, that a child can be diagnosed in a single visit providing one has the appropriate tools and appropriate knowledge to know what to look for and that without appropriate treatment Michelle would meet the criteria for the full diagnosis of RAD in the future.

The Parents maintain that the notion that a doctor must make a diagnosis based upon observation at the time of adoption was rejected in *York County Children and Youth Services*. The doctor there could see the significant residual effects of earlier attachment problems. Here Michelle demonstrated problems consistent with attachment problems or other mental or emotional handicaps. On this issue, the Parents assert that in *Ross v. Department of Public Welfare*, 811 A.2d 1076 (Pa. Cmwlth.2002), where the county agency did not advise the adoptive parents of a history of mental illness in the biological family, the Court held that they were due adoption assistance payments under *Gruzinski v. Department of Public Welfare*, 731 A.2d 246 (Pa.Cmwlth.1999), where a family that otherwise qualified but was not informed of adoption assistance was entitled to retroactive adoption assistance payments.

### III

The Court is constrained to agree with the position of CYS in this matter. First, in *Allegheny County Office*, the Court reiterated in a footnote that the parties stipulated in lieu of a hearing that the boy was eligible for adoption subsidy payments because he was "a bi-racial child" with "special needs," including the diagnosis of ADD. The parties also stipulated that the child was placed in the adoptive home on July 27, 1987 and adopted on October 5, 1989 and that he was eligible for adoption subsidy payments until he reached the age of eighteen due to his status as a bi-racial and a special needs child. As for the county agency's argument that the finding that "both" of the child's eligibility factors existed prior to his placement and adoption was not supported by the record, the Court noted that the child indeed was diagnosed with ADD several years after his

---

4. The Parents intervened in this matter. The Department did not file a brief after an order to do so, and the Court precluded it from filing a brief or participating in oral argument.

adoption but that this fact was only one of two characteristics rendering him eligible for adoption subsidy payments. The state regulations simply require that a child have one qualifying characteristic. Thus *Allegheny County Office* does not stand for the proposition that an adoptive family may be entitled to adoption subsidy payments based upon a physical, mental or emotional condition that arises after the adoption.

This case is distinguishable from *York County Children and Youth Services* because of the absence of evidence of a diagnosis at the time of adoption. Although the Parents refer to Walters' statement that some of Michelle's anxiety disorder is based on early trauma and was prevalent before her placement in 1999, citing N.T. September 22, 2005, p. 74; R.R. 205a, this is the same exchange relied on by CYS in which Walters declined to diagnose generalized anxiety disorder or other unspecified childhood disorder as of 1999. The evidence clearly is distinct from that presented in *York County Children and Youth Services.*

In the absence of a diagnosis at the time of adoption, even if rendered retroactively as in *York County Children and Youth Services,* the adoptive parents did not meet their burden to establish that Michelle was a special needs child at the time of adoption. Furthermore, the Parents cite no authority to support their position that the statements in the child profile concerning mental illness and certain diseases in the

birth family constituted proof of a genetic condition indicating high risk of developing a disease or handicap under § 3140.202(b)(4)(ii), and the ALJ did not rely upon this in her reasoning. Also, the Court disagrees with the Parents' view of *Ross.* There on appeal of the initial denial of a request for assistance, the parties stipulated that the parents were entitled to retroactive assistance for two girls, and the issue was whether they were entitled to interest.

In view of the Court's holding on the issue of eligibility, it need not address CYS's claims that the ALJ erred in awarding up to $4000 in legal fees, in awarding a quarterly clothing allowance and in awarding payments retroactive to the time when foster parent payments were still being received.[5] The Court reverses the order of the Bureau affirming the adjudication of the ALJ.

President Judge COLINS dissents.

### ORDER

AND NOW, this 28th day of November, 2006, the final administrative action order of the Chief Administrative Law Judge of the Bureau of Hearings and Appeals of the Department of Public Welfare is reversed.

---

5. CYS also briefly argues a contention that the Department violated CYS's due process rights by granting the rehearing when no request for a continuance was made until after the first ALJ's decision and by the second ALJ's ignoring the findings of the first, resulting in granting the

Parents two bites at the apple. They respond first that CYS has waived this issue by failing to state it in its petition for review. Pa. R.A.P.

1513(d)(5) requires an appellate petition for review to contain "a general statement of the objections to the order or other determination...." CYS's petition for review does not mention this issue, and the Parents are correct that issues not stated in the petition for review but raised first in the brief are waived. *S.T. v. Department of Public Welfare, Lackawanna County Office, Children, Youth & Family Services,* 681 A.2d 853 (Pa.Cmwlth.1996).